217 So.2d 57

**Jo Ann M. KILLINGSWORTH**

**v.**

**Marvin H. KILLINGSWORTH, Jr.**

**3 Div. 202.**

Supreme Court of Alabama.

Dec. 12, 1968.

</div>

**346**

Hill, Robison & Belser, Montgomery, for appellant.

Rushton, Stakely & Johnston, Montgomery, for appellee.

COLEMAN, Justice.

The wife appeals from a decree granting divorce to the husband on the ground of cruelty.

In his bill of complaint, the husband charges:

"5. That the respondent has since their marriage committed actual violence on complainant's person attendant with danger to his life or health or that from respondent's conduct there is reasonable apprehension of such violence; that respondent has violently assaulted complainant and has threatened him on many occasions; that your complainant and respondent separated on to-wit: November 15, 1964 and have not lived together as man and wife since that time."

The wife denies these allegations. The contested issue was whether these allegations are true. Testimony was heard ore tenus. The trial court found that the husband is entitled to the relief prayed for in his bill of complaint. The wife argues that the court erred in three particulars.

*Assignments 1, 4, and 5*

Assignment 1 recites:

"1. The lower Court erred in allowing Complainant to testify as to any ground of divorce as it affirmatively shows in the deposition of the Complainant that no acts were committed by Re-

spondent that would entitle Complainant to a divorce. (R.P. 39 & 47)"

Respondent argues that the testimony of complainant, given at the trial, is in "absolute conflict" with his testimony "taken at deposition," and therefore his "testimony was impeached and his testimony should not be considered."

Respondent argues further that if complainant's testimony be not considered, there is no testimony to support the charge that respondent had committed acts of cruelty against her husband, and, therefore, there is no evidence to support the decree granting a divorce for cruelty, which is the only ground for divorce alleged in the bill of complaint. Consequently, respondent argues, the court erred in granting a divorce to complainant.

With respect to the charge of cruelty, the husband testified at the trial that he moved out of their house in October, 1964; that shortly thereafter, in November, the wife got out of the hospital and he went back and stayed a few days with her; that in the same November, prior to Thanksgiving, he left and had not been back; that "about that time, or immediately prior to that time," his wife "threatened my life"; that the wife used words "something to the effect that she would blow my brains out with the gun which we have, had in the house—." The husband testified further:

"Q (Mr. Moore) Now, was this about the time you left and never went back no more to stay?

"A She had, when we discussed a divorce, which I had discussed with her when I left prior to the time I left and after I left, I went back and discussed it with her, and she made the statement on occasions that, after we tried to discuss it, and start off in an attempt, kind of, sort of way and end up in rather a heated discussion, but always ended up with, with the ending of she would see me six feet under before she would give me a divorce, or blow my brains out before she would give me a divorce.

"Q Has she ever threatened you with any sort of fire arm prior to this time?

"A Yes.

"Q What fire arm?

"A Well, it's a twenty-two pistol, automatic pistol.

"Q Was there a pistol in the household?

"A Yes.

"Q Did she ever produce it?

"A Yes.

"Q Did she ever produce it when it was loaded?

"A Yes.

"Q Did she ever threaten to use it?

"A I would say threaten if she had it in her hand, said she was going to blow my brains out, yes.

"Q Did that happen?

"A Yes.

"Q On more than one occasion?

"A Yes.

"Q Did it happen several times?

"A Yes, I've, I've taken the gun from her on many occasions, yes.

"Q Was it ever necessary for you to take it and hide the ammunition?

"A Yes.

"Q Did she ever threaten you with any other deadly weapon?

"A Well, with a knife.

"Q All right. Is that a butcher knife?

"A Yes.

"Q When and where?

"A It was when we were living on Thomas Avenue, in the kitchen of our home.

**348**

"Q From your wife's disposition and temper and demeanor, did you believe that she would do you bodily harm?

"A Yes, I, I was on guard to protect myself, sure."

The husband further testified that the wife had a violent temper, tore up household furnishings, tore kitchen cabinet doors off the hinges, threw her own wrist watch on the wall and broke it, defaced furniture with glass jars, tore up a set of draperies, tore up lamps and screens, tore up pots and pans by beating on them until the handle came off, tore up her own clothes, used abusive language and profanity towards the husband, and, on one occasion, she struck the husband so hard that he had to stop the automobile while riding down the highway.

On cross-examination, the husband testified:

"Q Mr. Killingsworth, do you recall giving your deposition on March the 16th, '65?

"A Yes, I do.

"Q Did you list any of the reasons that you have stated today as the problems with your marriage, that is the physical cruelty, the gun, the knife?

"A We didn't go into detail on any of this, the reasons that you mentioned.

"Q Did I ask what your basic problems with your marriage was?

"A Yes.

"Q And did you tell me disagreements, temper, abusive language, and that sort of thing, and just kept emotional disturbance between both of us continuously?

"A Yes, I made that statement.

"Q And I asked you was that all, and you said, is basically all, yes?

"A Well, basically all, yes, didn't go into detail of all these things.

"Q And I asked you the next question (showing it to the witness), no other problem, and you testified, no, no, that is all?

"A (Looks at it) Well, basically, all, I would say, would be leave it open to you if you want to go into any detail of these things and could go.

"Q I asked you, any other problem, and you said, no, no, that is all?

"A Well, I had—

"Q (Interrupting) You were under oath at this time?

"A We were both under oath, Mr. Belser.

"Q I understand it, when you gave this testimony, were you under oath?

"A Yes.

"Q Were you under oath?

"A Yes, we were under oath, to the best of my knowledge.

"Q Is your testimony completely opposite to that today?

"A I am under oath today, and state that these things that I have said today—

"MR. MOORE: Just a minute, please, sir. I think he's arguing with the witness. I think The Court can make up its mind, disagreements, temper, abusive language, and emotional disturbance covers just about anything in the world, including threat to kill him.

"THE COURT: Let him cross-examine him on that. Overrule your objection.

"Q (Mr. Belser) Now, what happened between the 16th day of March and today, Mr. Killingsworth, to make you change your testimony?

"A There hasn't been anything to make me change my testimony.

"Q Well, how do you account for it being changed, then?

"A Because the things I have had, and things I have experienced which are included in there, I assumed, if you were interested in it you would go into detail and ask me about them."

In the wife's brief, counsel states:

"It is quite clear that the testimony of Marvin Killingsworth (*the husband*) during the trial of this cause (R. 39) is in absolute conflict with his own testimony taken at deposition (Respondent's Exhibit 2, R. 47). . . . ." (Italicized Par. Supplied), and further:

"This testimony given at trial, (R. 39) and the testimony given at deposition (R. 47) are in complete conflict and his testimony was impeached."

We have set out above all the husband's testimony which appears on page 39 of the transcript. We set out next the pertinent part of the husband's deposition which appears on pages 46 and 47 of the transcript, to wit:

"Q During the fall of '64, did you talk to Doctor White, who is the pastor of the First Baptist Church?

"A Yes, I did.

"Q What conversation did you have with him, sir?

"A Well, in general about our problems, our marital problems, the way we got along, the way we didn't get along.

"Q What did he tell you about it; did he make any comments or suggestions?

"A He suggested that we go to a marriage counselor, I believe, at that time.

"Q And that is all his suggestions were?

"A No, he discussed what marriage was and what a successful marriage had to contain from both parties to be a success.

"Q Did you reach any conclusion as a result of talking to Doctor White concerning your marriage?

"A Well, I consented to go to a marriage counselor and discuss it to see what—

"Q (Interrupting) Did you go to one?

"A Yes.

"Q Who was that you went to see?

"A Doctor R. B. Davidson.

"Q Did you go to see Mr. Ramage, too?

"A Yes, I went to see Mr. Ramage.

"Q What did you tell Mr. Ramage?

"A I discussed with him the problems that we had, basically the same thing we had talked about with Doctor White.

"Q Did you tell him you were going to try to make any adjustments in order to work your marriage out?

"A No.

"Q Did you tell Doctor Davidson that?

"A I told him about the same thing.

"Q What did you tell him?

"A I told him the reasons for my feeling the way I felt about our marriage and explained the situation to him, purely for the sake of letting him weigh both sides of it and to see if the way I felt was the normal way to feel.

"Q What did you tell him the trouble was?

"A Disagreements, temper, abusive language, and that sort of thing, that just kept emotional disturbance between both of us continuously.

"Q That was all?

"A That is basically all, yes.

"Q No other problem?

"A No, no, that is all."

As we understand the wife's argument, she contends that the husband's testimony on deposition contradicts his testimony at the trial, and, therefore the husband is bound by his own testimony on deposition which is a good defense to his suit. See 169 A.L.R. 798 for annotation on "Binding effect of party's own unfavorable testimony."

In Megason v. Boleyn Lumber Co., 140 La. 431, 73 So. 257, the Supreme Court of Louisiana, in a suit to recover title to land, held that one of the plaintiffs could not recover because of his admission in answers to interrogatories that he and his brothers had not purchased the land but had inherited it from their father. The court said:

"The admission on the part of James C. Megason that he did not purchase the property, and did not pay anything for it, but acquired it by inheritance, makes out defendant's case fully, and is binding upon him, we think, and cannot be withdrawn to the prejudice of defendant.

"But we do not think the title of the other plaintiffs, as established by their recorded deed, can be overthrown by this testimony; especially after the witness has retracted it." (73 So. at page 258)

As to the plaintiff who was bound by his own testimony on deposition, the Louisiana court reversed the judgment in his favor, but affirmed as to his brothers. In *Megason*, the testimony of the plaintiff on deposition squarely contradicted his subsequent retraction. Assuming, but not deciding, that, as contended by appellant in the instant case, the husband's unfavorable testimony on deposition binds him and estops him, on the trial, from contradicting his deposition, we are, nevertheless, not persuaded that the contradiction exists. On deposition, quoted above from page 47 of the record, the husband was asked "What did you tell him?," referring to Dr. Davidson. The husband replied: "I told him the reasons for my feeling the way I felt . . . .," etc. The husband was next asked, "What did you tell him the trouble was?" The husband answered "Disagreements, temper, . . . .," etc. The next question is: "That was all?," and the husband replied, "That is basically all, yes." and "No, no, that is all."

■ It seems to us that a fair understanding of the husband's answers to the quoted questions, is that the husband was being asked what he had told Dr. Davidson, not what the trouble was. If the husband had told Dr. Davidson that the only trouble was disagreements, temper, etc., his answers on deposition were truthful, although he had not told Dr. Davidson of the threats with knife and pistol as to which the husband later testified on the trial. Because we do not think the husband's testimony on deposition contradicts his testimony on the trial with respect to cruelty, we hold that he was not concluded by his deposition and that the trial court could consider the husband's testimony given on the trial to prove that the wife had committed acts of cruelty sufficient to satisfy the requirements of the statute; Title 34, § 22, Code 1940. Assignments 1, 4, and 5 are not sustained.

### Assignment 6

Respondent assigns as error:

"6. The lower Court erred in refusing to allow Respondent to introduce Respondent's Exhibit # 9. (R.P. 109–110)"

On transcript page 109, the record indicates that Respondent's Exhibit No. 9 was marked for identification. This exhibit appears to have been "a note from a pastor." The court sustained objection to introduction of the note on the ground that the court had been told that Dr. White himself, who apparently wrote the note, was "going to testify, and he would be the best evidence." So far as we have ascertained, the record does not disclose the contents of this exhibit.

■ The propriety of the court's ruling in refusing to allow the introduction of this document is not reviewable when the document is not set out in the record. Forest Investment Corp. v. Commercial Credit Corp., 271 Ala. 8, 11, 122 So.2d 131; Lee v. Southern Pipe and Supply Co., Ante p. 37, 214 So.2d 313, 317.

Assignment 6 is not sustained.

### Assignments 2, 3, and 4

Assignment 3 recites:

"3. The lower Court erred when it refused to direct Dr. J. R. White to testify when requested to do so by Respondent in that the information attempted to be elicited was not privileged and was material. (R.P. 191)"

Dr. White testified that the parties to the instant suit attended the church of which the witness was pastor; that the husband has held the office of deacon in that church; that the witness had had conferences with the husband and wife concerning their marriage, "off and on, now, for sometime" in the year 1964; and that in these discussions, their marital problems were discussed.

On page 191 of the record, the following is shown to have occurred during the examination of Dr. White:

"Q Did they tell you in these conferences the things that they thought, or felt, or express to you their sentiment?

"A That's correct.

"Q Now, based on these discussions, did you arrive at an opinion as to the root of the problem?

"MR. MOORE: We object.

"THE COURT: Sustain the objection.

"MR. BELSER: On what grounds, Your Honor?

"THE COURT: That's an ultimate question for the Court to decide.

"MR. BELSER: We except (sic) that ruling.

"Q (Mr. Belser) Did Marvin state to you that his wife had threatened his life with a gun or with a knife or any other instrument?

"A Your Honor, that question violates the confidences of the conference room, and I can't answer that.

"MR. BELSER: Your Honor, I respectfully request that the Court instruct Dr. White as to his rights in view of the witness in this case.

"THE COURT: I think Dr. White knows his rights. I have already discussed with him those rights, but I am not going to hold him in contempt of Court for refusing to violate the sanctity of his counselling.

"MR. MOORE: Now, I further object to the question, anyway. I object to the question for the record.

"MR. BELSER: We respectfully except (sic) the Court's ruling, and again ask the Court if the Court will instruct the witness to answer the question, if he knows the answer?

"THE COURT: No, I will not.

"MR. BELSER: We respectfully except. Thank you, Doctor."

Thus ended Dr. White's examination.

■ Appellant asserts and appellee concedes that there is no privilege in Alabama with respect to a communication made by a person to a clergyman or spiritual adviser. The authorities we have examined support this proposition. We quote some of the text writers.

"Under the common law, communications to clergymen, or other church or ecclesiastical officers, are not privileged, although judges have been reluctant to compel the disclosure of such communications; that rule still obtains except in so far as it has been changed by statute.

. . . ." (58 Am.Jur., Witnesses, § 531)

"At common law there was no privilege as to communications or confessions to a spiritual adviser; and, in the absence of statute, no such privilege exists; but, under appropriate statutory provision, it has been held that clergymen or priests could not disclose, over objection of the party so confiding, confessions or admissions made to them in the course of discipline enjoined by their respective churches." (97 C.J.S. Witnesses § 263)

"There is no privilege in Alabama for communications between a clergyman and a person who confesses sin to the clergyman. . . . ." Law of Evidence in Alabama, McElroy, Second Edition 1962, Vol. 3, page 214, § 419.01.

So far as we are advised, there is no decision by this court deciding this question. See Tonsmeire v. Tonsmeire, 281 Ala. 102, 199 So.2d 645, which is not directly in point. We are not advised of any statute of this state which makes privileged a communication made by a person to a spiritual adviser.

■ According to all the authorities which the parties have cited and those authorities which we have been able to find, under the law of Alabama, the witness did not have any privilege to refuse to answer the question asking whether the husband had stated to the witness that the wife had threatened the husband's life with a gun or knife. The trial court erred in refusing to instruct the witness to answer the question.

Appellee says that the ruling of the court, if error, was harmless because the appellant was not injured by the ruling. Appellee says the question called for a "yes" or "no" answer, and that:

"If the witness had answered 'yes' he would merely have corroborated the testimony already given by complainant. If he had answered 'no' his answer would have had no effect on the outcome of the case. If the question was asked for the purpose of impeaching complainant's testimony no proper predicate had been laid and hence the answer would have been inadmissible. It, therefore, appears that the court ruled properly and in the event that the ruling was incorrect the respondent was not injured thereby."

Appellee is correct in saying that a "yes" answer would have corroborated the testimony of the husband and would not have benefited the wife. We are of opinion, however, that a "no" answer would have benefited the wife.

The husband's right to divorce depends on his own testimony. He is the only witness who testified that the wife committed or threatened to commit against the husband actual violence on his person, attended with danger to his life or health or that from the wife's conduct there was reasonable apprehension of such violence. The wife's testimony squarely contradicts that of the husband. All other witnesses, with whom the husband had conferred concerning the cause of his marital difficulties, had testified to effect that the husband had not stated to the witness that the wife had committed the alleged acts of violence. The husband's failure to state to the witness, Dr. White, that the wife had committed such acts would further strengthen the wife's contention that she had not done so and that the husband's testimony was false. Whether Dr. White's answer would have caused the trial court to reach a different finding we are not able to say.

■■ ". . . . The rule is that admissions of a plaintiff are competent evidence to defeat a divorce . . . ." Lyall v. Lyall, 250 Ala. 635, 638, 35 So.2d 550, 552. The husband's failure to mention to any of his counselors the wife's alleged acts of violence, or threats to commit such acts, has the effect of casting doubt on the truthfulness of his testimony that the wife had committed such acts. If the wife was, in truth, guilty of the numerous violent acts

which the husband testified she committed, and the husband was attempting to tell his counselors everything about his marital difficulties, and the cause thereof, a reasonable man might consider it strange that the husband would omit to mention numerous attempts and threats on his life. A reasonable inference would be that he did not mention the attempts and threats on his life because the wife had not made them. The husband's omission to mention the attempts and threats to the persons from whom he was seeking help is in the nature of an admission against the husband's interest, and is proper to be shown because it is competent to discredit the husband's testimony and to defeat his claim to a divorce.

". . . . The true rule on this subject is as follows: If a question is propounded to a witness on the stand, the answer to which is *prima facie* relevant and legal testimony, and the court refuses to allow the witness to answer, this is error, for which a reversal will lie; for the reason, that 'the injury to the party consists in the refusal of the court to permit the answer to be given, and he can do nothing more to prove the wrong done him than to show that he has asked a legal question, the answer to which, by the action of the court, was denied him.'—Nailor v. Williams, 8 Wall. 107, [19 L.Ed. 348]. Where no answer is given by the witness, as in this case, this does not repel the presumption of injury, provided the question itself is sufficiently definite to indicate the nature of the answer sought to be elicited, and such answer is *prima facie* relevant, material, and otherwise legal.—Roberts v. State, 68 Ala. 515. In such a case, it would add little or nothing to the enlightenment of the court, for the counsel to state what is proposed to be proved by the question, because this is shown by the question itself, so far as to justify the admissibility of the answer.

"It is only when the question is so general in its nature, that the answer sought to be elicited may as well be *prima facie* irrelevant and illegal testimony, as relevant and legal, that the exclusion of the question, and the refusal of the court to allow the witness to answer it, will be regarded as free from error. It is reasonable, in this class of cases, to require the counsel to inform the court what is proposed to be proved, so that the court may see that he seeks to elicit testimony which is proper to be admitted, and not that which is improper.—Allen v. State, 73 Ala. 23. If this is not done, it may be inferred by the court that, in view of the broad and comprehensive nature of the interrogatory, the answer of the witness might have been illegal, irrelevant, or even beneficial to the party. There should be no such presumption, however, in the first case, because the question is sufficiently narrow to preclude it, and the party has the legal right to examine the witness as to all relevant and legal matters within his knowledge. When the court denies this right—and refuses to permit its exercise—there is manifest error; and error imports the presumption of injury, unless it is clearly repelled. The adjudged cases in this State can all be harmonized, in our opinion, with this principle, although some expressions may be found which seem susceptible of a contrary construction.—Burns v. State, 49 Ala. 370. However this may be, the rule above announced is, in our opinion, the correct one." Phoenix Insurance Co. v. Moog, 78 Ala. 284, 308, 309.

In a later case, this court said:

". . . . We reaffirm the rule as stated in Phoenix Ins. Co. v. Moog, 78 Ala. 284, 308, 56 Am.Rep. 31, and which has always since then been the law in this state. Where a question on its face calls for an answer which would clearly be both relevant and competent evidence, it should be allowed; and its exclusion must be deemed erroneous, and prima facie prejudicial. . . . ." Birmingham

Ry. L. & P. Co. v. Barrett, 179 Ala. 274, 290, 60 So. 262, 263, 267.

To like effect, see Southern R. Co. v. Gantt, 210 Ala. 383, 386, 98 So. 192; and McGill v. Varin, 213 Ala. 649, 651, 652, 106 So. 44.

In the instant case, the question to the witness called for a clearly relevant and competent answer. He had testified that he had had conferences with the husband concerning the husband's marital difficulties. By his own testimony, the witness had knowledge of what the husband had said to the witness and he was competent to answer the question. It is, therefore, within the rule declared by the decisions cited and its exclusion was error, and prejudicial to appellant so far as this record informs us.

The wife made no offer to show what would be the answer of the witness to the question. We have written perhaps at undue length to show that, under the rule of Birmingham Ry. L. & P. Co. v. Barrett and other cases cited above, the wife was not bound to show the expected answer in order to have review of the ruling sustaining objection to the question.

There is another principle which makes unnecessary an offer to show the expected answer in the present case. That principle has been stated as follows:

"Further, an offer of proof is not necessary, in order to preserve an objection to a ruling of exclusion for review, where the offer of proof would be a useless gesture by virtue of the attitude of the trial court, or where the court has ruled broadly that evidence of a particular class or type, or evidence in support of the theory or fact which the party is seeking to establish, is inadmissible." 4 C.J.S. Appeal and Error § 291.

". . . . However, the making of an offer of proof is not a condition of the right to a review of a ruling excluding evidence unless the nature of the evidence intended to be elicited by the challenged question is not apparent. And the actual offer of evidence upon an issue is not necessary to preserve the question for the appellate court if the trial court rules that no proof upon that issue will be received." 5 Am.Jur.2d, Appeal and Error, § 604.

The Court of Appeals of Alabama has said:

"The court having ruled in positive fashion that it would not admit any evidence tending to show that the extradition was sought in aid of the collection of a debt, an actual offer of evidence upon this issue was unnecessary to preserve the question for appellate review. See 3 Am.Jur., App. & Error, Sec. 354; La Rault v. Palmer, 51 Wash. 664, 99 P. 1036, 21 L.R.A.,N.S., 354." Bishop v. State, 38 Ala.App. 667, 669, 92 So.2d 323, 325.

In the instant case, the trial court had ruled twice that the witness would not be required to answer any question as to what the husband had said to the witness in conference. An offer of proof would have been a useless gesture.

For the error pointed out in Assignment 3, the decree is reversed and the cause remanded.

Reversed and remanded.

LAWSON, SIMPSON and BLOODWORTH, JJ., concur.