THOMPSON, Judge.
K.W. (“the mother”) appeals the termination of her parental rights to her son, D.W. (“the child”). In its termination judgment, the trial court also terminated the parental rights of E.G. and L.S., two men who were named by the mother as possible fathers of the child. The trial court also terminated the parental rights of any unknown father of the child.
We note that much of the factual history of this case is derived from a series of reports (hereinafter “court reports” or “DHR court reports”) prepared by the Department of Human Resources (“DHR”) and submitted to the trial court; those court reports were admitted into evidence during the termination hearing, which took place on March 28 and 29, 2002. Much of the witnesses’ testimony at the termination hearing was based on those court reports. The court reports were admitted into evidence without any objection, and the parties referenced various facts in the court reports in support of their positions. On appeal, the mother has contended that the trial court’s reliance on those court reports deprived her of her due-process rights. As will be discussed later in this opinion, given the facts of this case, we find the mother’s argument on this issue to be without merit; therefore, we have referenced those court reports in setting forth the facts and procedural history of this ease.
The record indicates that on May 27, 1998, W.P. and M.P., the parents of E.G., filed a petition seeking to have the child declared dependent and seeking custody of the child. In their petition, W.P. and M.P. alleged that the child had lived with them since his birth in June 1997 and that the mother had agreed to let them raise the child. The record indicates that before the child was bom, the mother signed documents evidencing her intention to allow W.P. and M.P. to adopt the child; those documents were never formally acted upon, apparently because the mother changed her mind about the adoption when the child was born. In response to W.P. and M.P.’s petition, the mother moved for custody of the child.
It appears that the child remained in the custody of W.P. and M.P. until the trial court conducted a hearing on January 25, 1999. At that hearing, custody of the child was restored to the mother, and the child left the courthouse with the mother. The morning after that order was entered, however, the child, who was one and a half at that time, was found alone on W.P. and M.P.’s doorstep; the mother maintained that E.G. had taken the child from her at gunpoint the night before.
As a result of that incident, DHR filed a new dependency petition, and the child was taken into protective custody and placed in a foster home. W.P. and M.P. moved to intervene in the dependency action that had been initiated by DHR; that motion was denied. The child has remained in DHR’s custody in foster care since January 26, 1999. The child spent approximately three weeks in his first foster home, and he was then transferred to the home of J.G. and D.G., who were the child’s foster parents at the time of the March 2002 termination hearing.
The trial court granted numerous continuances in the scheduling of the hearing of DHR’s January 1999 dependency petition. During that time, W.P. and M.P. and the mother had weekly supervised visitation with the child.
Also, in between DHR’s filing its dependency petition and the trial court’s hearing on that petition, DHR continued to submit *862 court reports. The DHR court reports dating from September 1998 all indicate that DHR social workers were concerned because the child did not seem to have a bond with or emotional attachment to the mother. An October 8, 1998, court report indicated that the mother was employed and raising another child, a daughter. The mother had graduated from high school and was attending a college nursing program. The report concluded that the mother’s home was an appropriate placement for the child.
A court report dated September, 2, 1999,[1] indicates that the child was doing well in his foster home; that the mother had “missed several of the visits for various reasons”; and that the social workers were still concerned that the child had not bonded with the mother. DHR recommended that the mother attend parenting classes, counseling, and that she complete a psychological evaluation.
The December 16, 1999, court report states that the mother had asked that visitation times or the times for meetings to develop Individualized Service Plans (“ISPs”) be changed to accommodate her schedule. It also indicated that the mother had on occasion failed to visit the child or had been late to the scheduled visitations and that she had been rude to the child’s foster parents. The report also indicates that as requested in the September court report the mother had completed a psychological evaluation. The report noted that the child did not seem to be emotionally attached to the mother.
The first court hearing on DHR’s dependency petition was conducted on April 18, 2000. On that same date, the trial court entered a dependency order.[2] The trial court’s April 13, 2000, order, which was based upon an agreement by the parties, provided that the mother would have weekly, supervised visitation with the child; that she maintain stable housing and employment; that she obtain counseling; and that she cooperate with DHR and all other service providers. The trial court also ordered the mother to submit to a drug test; the results of that test were negative. In its April 18, 2000, order, the trial court also granted W.P. and M.P. visitation with the child. We note that in March 2001, the trial court consolidated the dependency action W.P. and M.P. had filed with the action filed by DHR.
In an October 18, 2000, order, the trial court, among other things, terminated W.P. and M.P.’s visitation with the child and ordered that the mother’s supervised visitation continue. It does not appear from the record on appeal that W.P. and M.P. took any further action with regard to this case. They did not testify at the termination hearing, and they are not parties to this appeal.
On December 15, 2000, the child’s foster parents, J.G. and D.G. (“the foster parents”), filed a petition seeking to terminate the mother’s parental rights so they could adopt the child. The foster parents later moved the trial court to compel DHR to join their petition to terminate the mother’s parental rights. On April 10, 2001, the trial court entered an order noting that DHR had elected not to join the petition. DHR ultimately joined the petition to terminate the mother’s parental rights in December 2001.
*863 At the March 2002, termination hearing, the foster parents modified their petition to state that they wanted the mother’s parental rights terminated, but that they were not asking to adopt the child. The foster parents’ attorney stated that the foster parents were “doing that to preserve any funding for the child regarding federal legislation in the future.”
We note that throughout the trial of this matter, the trial court stated repeatedly that if there was a conflict between the oral testimony and the written documentation submitted into evidence, the trial court would rely on the accuracy of the written documentation in resolving those conflicts. Neither party objected to the trial court’s decision with regard to the manner in which it would resolve conflicts in the evidence. In fact, during the course of the termination hearing, each party objected to certain evidence presented by the other on the basis that the documentary evidence was more reliable.
Brandon Hardin, who had been a social worker for two years at the time of the termination hearing, testified on behalf of DHR. He also submitted a court report, dated February 26, 2002, that summarized in chronological order the facts as set forth in the DHR court reports. The February 26, 2002, court report also contains certain highlighted sentences, many of which are the same as those highlighted in the some earlier court reports, and it contains a summary of the mother’s visitations with the child. In that report, Hardin stated that because of “missed visits,” DHR had elected to join the foster parents’ petition to terminate the mother’s parental rights. The record indicates that the trial court relied to a great extent on that February 26, 2002, court report in reaching its judgment.
Hardin had taken over this case as its social worker on August 25, 2000. At the March 2002 termination hearing, Hardin testified that when he first became the social worker for this case in August 2000, DHR’s plan was to reunify the mother and the child. The mother has maintained stable housing since DHR has been monitoring her progress. Although she changed jobs several times, the mother has been consistently employed throughout the pen-dency of this matter; all of the DHR court reports indicate that Hardin or the earlier social workers were aware of the mother’s various jobs and the names of her employers. Hardin testified at trial, however, that he had asked the mother for income verification but that she had not provided it.
Hardin testified that the mother has made only one child-support payment of $40 or $50 while the child has been in foster care. Although the mother was never ordered to pay child support, the record establishes that, although not a proper substitute for paying child support, the mother has established a savings account for the child, and she often purchased clothes and gifts for the child.
In September 1999, the trial court ordered the mother to submit to a psychological evaluation. The mother did have a psychological evaluation in October 1999, but she was dissatisfied with the results of that examination. DHR scheduled another evaluation for March 2001, but the mother canceled that evaluation and said that she would reschedule it. Apparently, however, the mother did not reschedule that evaluation, and on April 10, 2001, the trial court ordered the mother to submit to that second psychological evaluation. The second psychological examination was completed on April 13, 2001.
Hardin testified that the child had had a tonsillectomy and that the mother did not call to check on the child for two days. Hardin stated that he told the mother the *864 operation was to occur during a particular week, but, on cross-examination, he never stated that the mother was informed of the exact date of that operation. The February 26, 2002, court report does not indicate that the mother was told the specific date of the operation. The trial court noted that the mother was informed of the “time frame” in which the operation was to take place.
Hardin testified that he had supervised the mother’s weekly visitation with the child, but that he did not believe that the child had formed any significant bond with or attachment to the mother. Hardin testified that in early 2001, in an attempt to facilitate the child’s establishing a bond with the mother, the mother began receiving “extended” visitation with the child; that visitation remained supervised. That “extended visitation” allowed the mother to visit the child one to four hours on alternating weeks, with one hour of visitation on the other week. Hardin testified that because he transported the child to visitation, he spent more time each week with the child than did the mother; Hardin estimated he spent two to three hours each week with the child when he transported him to visitation with the mother.
On June 1, 2001, DHR filed a motion seeking permission to grant the mother unsupervised visitation with the child. As a basis for that motion, DHR stated that “since October 17, 2000, the mother has cooperated with DHR and has participated in counseling, parenting classes, TASC,[3] and visitation.” (Emphasis added.) That motion also cited the recommendations of the mother’s counselor and the results of a psychological evaluation that stated that more visitation would improve the bonding between the mother and the child. The foster parents and the child’s guardian ad litem objected to DHR’s motion to allow the mother unsupervised, extended visitation.
DHR’s June 8, 2001, court report indicates that the mother did not trust the foster parents, the child’s counselor (who had performed the first psychological evaluation of the mother), or DHR, and that she believed DHR had aligned with the foster parents in order to enable the foster parents to adopt the child. The report stated that the mother had continued to make progress and that she had tried hard to strengthen the bond between the child and her. In that June 8, 2001, court report, DHR asked the trial court for the discretion to determine the length and frequency of the mother’s visitation and whether that visitation should be supervised. DHR noted that the trial court’s restriction of allowing only Hardin or his supervisor to supervise visitation had limited the mother’s visitation with the child; it contended that lengthening the visits and allowing unsupervised visitation would strengthen the bond between the child and the mother.
On June 8, 2001, the trial court considered DHR’s motion to allow the mother unsupervised visitation. On that same date, the trial court entered an order requiring that the mother’s visitation continue to be supervised, but providing that the visitation could be supervised by a “counselor and/or treating professional.” The trial court set the visitation issue for further argument on June 29, 2001.
DHR’s June 29, 2001, court report stated that the mother continued to progress in attempting to bond with the child, but that the trial court’s order requiring that visitation be supervised, and then only by certain people, had made it difficult for *865 “meaningful” visitation to take place and had limited the mother’s contact with the child. The report also noted that the child continued to be confused about the identity of his family. We note that the June 29, 2001, court report, which was submitted by Hardin, for the first time details incidents from the mother’s previous visits with the child that were not included in his or other social workers’ previous court reports. That court report also contains many highlighted sentences, most of which reflect negatively on the mother and a few of which can be said to be misleading.[4]
On July 2, 2001, the trial court entered an order modifying its previous visitation orders. Pursuant to the July 2, 2001, order, the mother’s visitation was to comply with the recommendations of the various counselors and doctors, and DHR was to decide the frequency, location, and duration of those visits, as well as whether they were to be supervised. However, that order concluded by specifying that “visitation will be extended and supervised by desig-nee of [DHR].” (Emphasis in original.)
Hardin testified that although he had attempted to accommodate the mother’s work schedule in implementing her visitation with the child, the mother had missed 17 visits with the child since August 2000, when he began working on the case. The February 26, 2002, court report details 16 missed visitations since Hardin became the social worker for this case. Four of those visits were canceled not by the mother but by other people.
Hardin testified that after the August 1, 2001, he stopped calling the mother to remind her of visits in order to allow the mother to take responsibility for the visitation. Hardin testified that the mother had missed seven consecutive visits between August 22, 2001, and October 13, 2001, and that those missed visits had damaged the bond between the mother and child; he characterized the situation as back at “square one.” Hardin testified that on October 13, 2001, DHR decided to join the foster parents’ petition to terminate the mother’s parental rights.
The February 26, 2002, court report, which was submitted by Hardin and which summarizes the mother’s visitations, however, does not appear to support Hardin’s testimony that the mother missed seven consecutive visits. That report indicates that the mother canceled visits on August 28, 2001, September 25, 2001, and October 11, 2001; the report contains no documentation of any other missed visitations before the date on which DHR decided to join the foster parents’ petition to terminate the mother’s parental rights. The report indicates that the mother actually attended visits on September 11, 2001, and September 20, 2001. The report indicates that on September 9, 2001, and October 1, 2001, the mother contacted Hardin to inform him that her schedule on her new job prevented her from attending visitation. The report indicates that Hardin refused the mother’s request that she receive after-hours visitation, stating that DHR had already attempted to accommodate the mother’s schedule.
*866 Debra Atchison, the child’s counselor, testified at the termination hearing. Throughout her testimony, Atchison repeatedly emphasized that the child was not “attached” to the mother, but that he had a strong attachment to the foster parents. Atchison stated that the mother’s supervised visitation was sufficient to allow the child to form an attachment to the mother, but that that had not occurred. Atchison also stated that consistent visitation was important in establishing the bond between the child and the mother, and that she believed that if the mother missed seven visits in a row, that would indicate the mother had no interest in forming such a bond.
Atchison also emphasized during her testimony that the child was confused as to the identity of his family. Atchison testified that the child had distinguished his foster mother as “white mama,” and the mother as “black mama,” and by calling the foster mother “mama” and the mother by her first name. On cross-examination, Atchison admitted that she had not informed the child of the possibility that he might return to live with his mother or addressed any issues the child might have with regard to that potential transfer.
During the pendency of this matter, the mother expressed frustration to DHR social workers that the foster parents did not dress the child in the clothes she purchased, or if they did, they purchased the same outfit for their other foster child. The mother objected to the foster parents dressing the children alike because the children were not brothers. The mother also objected to the foster parents referring to the child by what she contends in her brief on appeal is a more “Anglo” version of the name she had given the child.
L.S., one of the men named by the mother as the child’s possible father, testified at the termination hearing. L.S. testified that he had lived with the mother after the child was born, while the child was living with W.P. and M.P. L.S. denied that he was the child’s father. L.S. testified that the mother had once stabbed him in the arm with a kitchen knife; L.S. testified that there was no reason for the attack, and that the mother “just clicked.”
The record indicates that the mother began attending counseling sessions with Marion Coleman in August 1999, after the dependency action was initiated. The mother stopped attending counseling for a three-month period between April 2000 and July 2000; in July 2000, she resumed counseling. The mother also attended and completed parenting classes. The mother was also ordered to complete a TASC program. DHR noted in the September 2001 court report that the mother did not begin that program until September 2000, five months after the trial court ordered her to do so; the mother did complete the TASC program.
Coleman’s office notes are included in the record on appeal. Those notes indicate that the mother was initially referred to counseling to address separation issues and emotion- or temper-control issues. Overall, Coleman’s office notes indicate that the mother made progress and had learned more effective coping mechanisms during the years she has spent in counseling. Coleman’s notes indicate that as early as the summer of 2000, the mother was very frustrated with the manner in which DHR was handling the case. During the summer and early fall of 2000, the mother also expressed concern that she was being criticized for the child’s alleged failure to bond with her, but at the same time, DHR and the trial court had refused to extend her visitation with the child so that that situation could be improved. We note that the record indicates that the mother has *867 never been considered a threat to the child’s safety. In August 2000, Coleman recommended that the mother’s visitation with the child be increased and that it take place in more natural environments so as to better address the bonding issues.
Coleman’s notes indicate that in late 2000, the mother was very worried about the situation with the child. Coleman continued to recommend that the mother’s visitation with the child be increased. Coleman’s office notes from early 2001 indicate that the mother was coping better with her frustration concerning the custody situation. The notes also indicate that the mother greatly enjoyed the home visits she had with the child, and that those visitations lessened the tension and stress the mother had apparently experienced during the visitations conducted at DHR facilities.
At the March 2002 termination hearing, Hardin testified that DHR had been asking the mother since 1999 about possible relatives with whom the child could be placed; none of the court reports document those requests. Hardin testified that the mother was secretive regarding her family and that, in response to DHR’s requests, she had only named a few family members as possible relative placements for the child. When asked on direct examination whether DHR had identified any appropriate relative resources, Hardin responded “None that want custody, no.” On cross-examination, however, Hardin testified that J.B., who is apparently the mother’s half-sister, came forward at a 2001 court hearing and expressed interest in taking the child. Hardin testified that he conducted a home study on J.B.
Hardin’s home-study report reaches no conclusion as to whether J.B. would be an appropriate placement for the child, and it does not appear from the home-study report that Hardin checked the three references J.B. provided. However, that report indicates that J.B.’s home is “in great shape” and is sufficiently large for the child, that J.B. earns $60,000 annually, and that J.B. had no adverse legal history other than a speeding ticket in 1993. The home-study report indicates that J.B. explained her failure to seek custody of the child earlier by stating that the mother had not fully explained the situation to her and also by explaining that her own daughter had recently died of leukemia. The report states that J.B. “[h]as come closer to .[the mother] and wants to see [the mother and child] reunited, and if not, she would like to keep her family together by taking custody.”
At the termination hearing, Hardin testified that J.B.’s entire motivation was that the mother ultimately receive custody of the child. Hardin apparently rejected J.B. as an alternate relative resource on the basis that J.B. intended for the mother to regain custody of the child. We note that the report indicates that J.B. had said she would take custody of the child if reuniting the mother and child was not possible. Hardin admitted that he did not inform J.B. about or invite her to any ISPs, and it does not appear that she was told she could visit the child. However, J.B. had not contacted DHR to inquire about the child or the progress of the home study since Hardin performed that home evaluation; J.B. did not attend the termination hearing.
The mother testified only briefly. The mother testified that she had intended to leave the child with W.P. and M.P. only briefly, but that they had refused to return the child to her. The mother has another child, a daughter named T.W., and she testified that she could not, at the time of the child’s birth, provide for both children.
The mother was attending “school” and had part-time employment at the time of *868 the termination hearing. The mother testified that she was willing and able to take care of the child’s needs. The mother denied missing seven consecutive visits between August 28, 2001, and October 13, 2001. The mother testified that she missed six visits; however, the dates of two of those visits were outside the referenced time frame and occurred after October 13, 2001, when DHR had decided to join the foster parents’ petition to terminate the mother’s parental rights.
In its judgment, the trial court found the child dependent, and it determined that the mother had failed to provide support for the child and had failed to maintain consistent visitation and contact with the child. The trial court also concluded that the mother was not capable of discharging her responsibilities to the child and that that condition was unlikely to change in the foreseeable future.
On appeal, the mother contends that the trial court, in relying on the court reports submitted into evidence by DHR, failed to provide the mother with a required level of procedural due process; the mother contends that the DHR court reports constituted inadmissible hearsay evidence and that the trial court improperly limited her testimony based on its improper admission of the court reports. First, we note that during the course of the termination hearing, the trial court stated that it was not limiting the parties’ presentation of evidence, but that much of the testimony was cumulative of the evidence submitted in the court reports. At one point, the trial court explained that ruling as follows:
“THE COURT: I am sustaining the objection [to the mother’s testimony concerning her employment history]. There is evidence already in front of the Court dealing with the issues that you are asking the witness about. If you wish to make reference to the last, most detailed court report, which is the February 6, 2002, court report, and pick sections out of that report that you are taking exception to or that you contend may have some factual misstatements, then you can ask your client about that.
“But I do not intend to continue to reconstruct the entire case when it is already in front of the Court. It is cumulative. Because I have already indicated that in order for me to weigh the [oral] testimony over somebody’s report, you need to have your witness indicate to me that that section of that report in an incorrect conflict. And weigh the evidence according to what I understand the rules of evidence and caselaw to be when there is a factual dispute.
“As it stands right now, I have indicated to all of the parties that I will weigh the written document over the [oral] if there is a conflict because of the fact that the case is so old, the files are so thick, the individuals have indicated to me that have testified as of this date that the written document if it conflicts with their oral testimony would be more correct than the oral testimony.”
Also, in responding to an objection that occurred during the mother’s cross-examination of Hardin, the trial court again stated that if a conflict arose between a witness’s testimony and the evidence in the court reports or other documents, it would give more weight to the documentary evidence. In response, the mother’s attorney stated that in light of that ruling, he wanted to ensure that the trial court had before it all of the court reports; he did not object to the trial court’s ruling. The record does not support the mother’s contention that the trial court did not allow the mother to testify as to any particular issue or that it had limited her testimony.
The mother cites this court’s decision in Y.M. v. Jefferson County Depart *869 ment of Human Resources, [Ms. 2010755, Jan. 24, 2003] — So.2d - (Ala.Civ.App.2003), in support of her argument that the court reports constituted hearsay evidence. Y.M. is a plurality opinion in which two members of this court determined that certain evidence in a DHR court report was hearsay evidence that was not admissible at an adjudicatory hearing such as a hearing on a petition to terminate a parent’s parental rights.
In Y.M., the mother had objected to the trial court’s taking judicial knowledge of DHR’s court reports. In this case, however, although she had several opportunities to do so, the mother failed to object to the introduction of any of the court reports at issue. The mother’s failure to object deprived the parties of the opportunity to debate whether the court reports might come within an exception to the hearsay rule. On appeal, DHR contends that the mother’s failure to object results in this issue not being preserved for appellate review.
In her reply brief, in response to DHR’s argument that she failed to preserve her argument as to this issue, the mother does not contend that she properly objected to the trial court’s ruling that limited her testimony. Rather, the mother contends that she is appealing from the trial court’s decision to sustain objections by DHR and the child’s guardian ad litem pertaining to her testimony about her employment history; the objections were made on the basis that the DHR court reports already set forth that information. We note, however, that the mother did not raise this issue in her postjudgment motion in the trial court. A party may not raise an issue for the first time on appeal. Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992); Somers v. McCoy, 777 So.2d 141 (Ala.Civ.App.2000). Additionally, the mother did not attempt to make any offer of proof regarding the testimony that she now contends was limited by the trial court. See Charles W. Gamble, McElroy’s Alabama Evidence § 425.01(1) (5th ed. 1996) (“The party offering the evidence, to which an objection has been sustained, must make an offer of proof as a condition precedent to appellate review.” (footnote omitted)). See also Strickland v. Mobile Asphalt Co., 650 So.2d 893, 894 (Ala.Civ.App.1994) (“The failure to make such an offer of proof resulted in a failure to preserve any error for our review.”). The mother has made no argument that objecting before the trial court or making an offer of proof would have been a “useless gesture.” See Killingsworth v. Killingsworth, 283 Ala. 345, 354, 217 So.2d 57, 66 (1968). Given the facts and the procedural posture of this case, we must affirm as to this issue.
The mother also argues that the trial court’s judgment terminating her parental rights was not supported by clear and convincing evidence. Section 26-18-7, Ala.Code 1975, which provides the statutory authority for the termination of parental rights, provides:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of pa *870 rental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
[[Image here]]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached by local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
This court has stated:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Resources, 636 So.2d 419 (Ala.Civ.App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with *871 drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
The mother contends that the trial court’s factual finding that she was unable to discharge her parental responsibilities with regard to the child was unsupported by the evidence. The record indicates that the mother has maintained stable employment and housing during the entire time this matter has been pending before the trial court. She has also reared her daughter and provided for her needs; DHR court reports indicate that the daughter is in excellent health and seemed to be a happy child. At the termination hearing, DHR cross-examined the mother regarding her recent inquiry whether DHR could assist her in paying the cost of the daughter’s child care, which seems to imply DHR’s questioning of the mother’s ability to support her children. This court has stated that in situations in which a parent is unemployed that that parent’s poverty is not a sufficient basis for taking a child away from a parent. C.B. v. State Dep’t of Human Res., 782 So.2d 781 (Ala.Civ.App.1998); K.M. v. Shelby County Dep’t of Human Res., 628 So.2d 812 (Ala.Civ.App.1993); In re Hickman, 489 So.2d 601 (Ala.Civ.App.1986). In this case, the mother is employed and supporting her daughter; DHR has not assisted the mother with paying for child care for that child. The mother’s request for some level of financial assistance, especially after she has been the sole support for her daughter for years, should not, given the facts of this case, be a factor that is held against her.
The mother has not paid child support for the child. However, the mother has provided clothes and gifts for the child, and she has established a savings account for him.
Although the record does not indicate how much the mother visited the child while he was living with W.P. and M.P., the record indicates that the mother has fairly consistently visited the child since 1999. DHR’s goal between that time and October 2001 was to reunite the mother and the child.
Hardin testified that DHR based its October 2001 decision to join the foster par *872 ents’ petition to terminate the mother’s parental rights on the mother’s missing seven consecutive visitations. As discussed earlier, however, the February 26, 2002, court report indicated that during the relevant period, the mother missed only three nonconsecutive visitations. Hardin never testified that the February 26, 2002, court report inaccurately set forth the history of the mother’s visitation. Further, that court report constituted documentary evidence upon which the trial court repeatedly stated it would rely in the event of a conflict between documentary evidence and the testimony of the witnesses.
We recognize that those involved in this case have been concerned about the child’s apparent failure to bond with the mother. DHR’s contention is that when the mother missed visitations with the child, the attempt to establish that bond was damaged. The mother’s missed visitations are a cause of concern. However, the record clearly indicates that the missed visits cannot be said to be the sole basis for the bonding concerns that are present in this case. The experts agreed that if the goal was to reunite the child with the mother, visitation needed to be more lengthy and unsupervised to allow the bond between the child and the mother to strengthen. However, the mother’s weekly visitation with the child has been brief and always supervised, even though she has not been considered a threat to the child’s safety. In the early part of 2000, the mother’s counselor recommended that the mother receive increased visitation with the child. However, it was not until early 2001 that the mother’s visitation was increased to allow her one to four hours of visitation on alternating weeks, and that visitation was still supervised. DHR court reports from that time noted that the mother was progressing and doing well in her efforts to engage the child and that the bond between the mother and child was improving. However, it was not until June 2001 that DHR advocated that the mother receive more lengthy, unsupervised visitation. Even then, however, the trial court continued to order that the visitation be supervised and in accordance with doctor’s or counselor’s recommendations.[5]
This case is unusual in that the foster parents initiated the action by filing the petition to terminate the mother’s parental rights in December 2000 during a time in which DHR was noting that the mother was making progress. Six months after the foster parents filed their termination petition, DHR moved the trial court to increase the mother’s visitation to facilitate bonding; the foster parents opposed DHR’s motion to allow the mother more and unsupervised visitation with the child. DHR did not join the foster parents’ termination petition until one year after it was filed.
DHR’s role in this case was to assist, if possible, in reuniting the mother and the child and to successfully move the child from the foster-care system. See § 12-15-1.1(3), Ala.Code 1975 (stating the legislature’s goal that dependent children be reunited with their parents “as quickly and as safely as possible”). The placement of a child in a foster home is meant to facilitate DHR’s goal of reuniting families.
*873 “Foster care has been defined as ‘ “a child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible.” ’ Smith v. Organization of Foster Families, 431 U.S. 816, 823, 97 S.Ct. 2094, 2099, 53 L.Ed.2d 14 (1977).
“ ‘The goal of foster care is not to create a new “family” unit or to encourage permanent emotional ties between the child and foster parents. Foster care is designed to provide a stable, nurturing, noninstitutionalized environment for the child while the natural parent or caretaker attempts to remedy the problems which precipitated the child’s removal or, if parental rights have been terminated, until suitable adoptive parents are found.’
“Mayberry v. Pryor, 422 Mich. 579, 374 N.W.2d 683 (1985), citing Smith, 431 U.S. at 861-62, 97 S.Ct. at 2119 (Stewart, J., concurring).”
Mitchell v. Davis, 598 So.2d 801, 804 (Ala.1992) (emphasis added).
In this case, however, the foster parents took a legal position against that DHR goal and have actively sought to prevent the reunification of the mother and the child by objecting to DHR’s motion to increase the mother’s visitation, by seeking to terminate the mother’s parental rights and, until the day of the termination hearing, by seeking to adopt the child themselves. At approximately the same time the foster parents argued against allowing the mother extended or unsupervised visitation, DHR evaluated and rejected J.B. as a possible relative resource, apparently because her goal was that the mother and child be reunited.
Further, the record indicates that the foster parents, DHR, and the child’s counselor have held the child’s confusion over the identity of his family against the mother. Clearly, the mother has not been an ideal mother, and the responsibility for some degree of the child’s confusion over his family situation should be attributed to the mother. However, at the same time the child was confused regarding the identity of his family, his foster family was actively seeking to separate him from the mother. The record indicates that the foster parents began referring to the child by a name other than that given to him by the mother, and that during one visitation, the child argued with the mother about his correct name. Thus, the evidence supports a conclusion that the foster parents’ conduct in seeking to terminate, rather than support, the relationship between the child and the mother, has also contributed to the child’s confusion and failure to bond with the mother.
We have no doubt that the foster parents love the child and that they were acting in what they believed to be the child’s best interests. However, for the one year the foster parents’ termination petition was pending, DHR left the child in a placement that did not support its reunification goal and that in fact actively sought to terminate the relationship between the child and the mother. During that time, Hardin noted that the mother was suspicious and distrustful of DHR. The record supports a conclusion that to some extent, that feeling was warranted.
The mother also contends that DHR did not establish that there were no viable alternatives to the termination of her parental rights. The mother contends that the placement of the child with J.B. was such an alternative. The mother’s allegation that DHR “dropped the matter” of considering J.B. as a possible placement for the child seems to have merit. DHR rejected J.B. as a possible placement for *874 the child at the time the home study was conducted. Hardin’s testimony indicates DHR rejected J.B. for the reason that J.B.’s goal was to reunify the mother and the child; at the time, however, that was consistent with DHR’s purported goal of reuniting the mother and the child. We note that the record indicates that J.B. has demonstrated little interest in obtaining custody of the child. J.B. has not contacted DHR or attended any court proceedings since the time Hardin conducted the evaluation of her home, and she did not attend the termination hearing.
The right to parent one’s child is a fundamental right, and the termination of that right should occur “ ‘only in the most egregious of circumstances.’ ” L.M. v. D.D.F., 840 So.2d 171, 172 (Ala.Civ.App.2002) (quoting Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990)). Also fundamental in the consideration of whether to terminate a parent’s parental rights is the best interests of the child. M.H.S. v. State Dep’t of Human Res., supra. The courts of this state apply a presumption that parental custody is in a child’s best interests. M.H. v. Calhoun County Dep’t of Human Res., 848 So.2d 1011 (Ala.Civ.App.2002). “In determining the child’s best interests, the trial court must consider whether a [parent] is physically, financially, and mentally able to care for the child.” V.M. v. State Dep’t of Human Res., 710 So.2d 915, 919 (Ala.Civ.App.1998). The party seeking to terminate parental rights must present clear and convincing evidence that the parent is not capable of or is unwilling to discharge his or her parental responsibilities. Id.
The facts of this termination case make it a close decision. In this case, there is no evidence that the mother was a danger to the child; that she was unable or unwilling to support the child; that she had physically, sexually, or emotionally abused the child; or that she was involved with or addicted to alcohol or illegal drugs. Those types of egregious behaviors are most commonly seen in the majority of cases involving the termination of parental rights.
The mother certainly has not been an ideal parent. Her behavior when the child was first born most likely would have supported the termination of her parental rights at that time. However, her parental rights were not terminated, and DHR, when it initiated its dependency action, began working with the mother to reunite the family. The child undisputedly needs stability and permanency in his life, and his failure to bond with the mother is a matter of concern. However, according to DHR’s own assessment, the mother has made a great deal of progress. We recognize that the mother’s missed visitations ■with the child has interfered with the child’s gaining an attachment to the mother; however, at the same time, we cannot ignore the strict limitations on the mother’s visitation with the child and the foster parents’ actions as other factors that contributed to that problem.
The termination of a parent’s parental rights is reserved for the most egregious of circumstances. Ex parte Beasley, 564 So.2d 950 (Ala.1990). Given the facts of this case, we cannot say that the foster parents and DHR have established by clear and convincing evidence that the evidence in support of their petition in this case rises “ ‘to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.’ ” V.M. v. State Dep’t of Human Res., 710 So.2d at 921 (quoting East v. Meadows, 529 So.2d 1010, 1012 (Ala.Civ.App.1988)). We must conclude that the trial court’s judgment terminating the mother’s parental rights *875 was, at the least, premature. We hold that the trial court abused its discretion in finding that clear and convincing evidence supported the termination of the mother’s parental rights.
REVERSED AND REMANDED.
YATES, P. J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., dissents.

. The date on this report is actually September 2, 1998; however, that date is probably a typographical error, because the report details events that occurred in 1999.

. The mother did not raise any issue pertaining to the delay in conducting the dependency hearing.

. "TASC” is not defined in the record, but it appears to be a program through which the mother was tested for the use of illegal drugs. Those tests were negative.

. One example is a paragraph in which the first sentence, which is highlighted, states that the trial court ordered the mother to submit to a psychological evaluation on September 2, 1999. The last sentence of that paragraph, which is also highlighted, states that the evaluation was completed on April 13, 2001, "19 months after the court order." However, the sentences between the two highlighted sentences in that paragraph indicate that the mother submitted to a psychological exam in October 1999, the month following the trial court’s September 2, 1999, order, but that she was not satisfied with the results of that evaluation and a second evaluation was scheduled for February 2001. The mother canceled the February 2001 evaluation; it was later conducted on April 13, 2001.

. At the termination hearing, the trial court explained that in its July 2, 2001, visitation order, the visitation it authorized DHR to use its discretion in granting was required to specifically comply with recommendations of the doctors and counselors involved in the case. In interpreting its July 2, 2001, visitation order, the trial court specifically stated that if the experts did not specifically recommend overnight visitation, DHR could not authorize such visitation.