The Lamar County Department of Human Resources ("DHR") filed a petition to terminate the parental rights of A.M. ("the father") and B.M. ("the mother") in September 2001 as to their two children, P.A.M. ("the son") and B.A.M. ("the daughter"). Following a one-day hearing, the juvenile court terminated the parental rights of the father and the mother. Both parents appeal; they argue that the juvenile court erred by terminating their parental rights when, they contend, (1) DHR did not make reasonable efforts to rehabilitate them; (2) DHR did not prove that the efforts it did make to rehabilitate them had failed; and (3) DHR did not properly consider and reject all viable alternatives to a termination of their parental rights.
A nonparent who seeks to terminate a parent's parental rights must prove by clear and convincing evidence that the children are dependent and that there are no viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950 (Ala. 1990).
Section 26-18-7(a), Ala. Code 1975, states, in pertinent part:
 "If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child . . . .
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional *Page 260 
conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the [DHR] . . . leading toward the rehabilitation of the parents have failed.
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated."
Section 26-18-7(b) further provides that if the child is not in the custody of the parents, the juvenile court may consider whether the parents are providing monetary support for the child, whether they are regularly exercising visitation with the child, and whether they are adjusting their "circumstances to meet the needs of the child."
During the hearing, Melanie Dulaney, the mother's DHR case manager, testified that she began working with the mother in 1990 when the mother was pregnant with the son. She was the mother's case manager throughout most of the 1990s. Initially, Dulaney testified, the mother needed basic home-management and parenting skills. Dulaney testified that she needed to learn to break housecleaning chores into manageable tasks. Dulaney also testified that after the son was born, the mother needed to learn the basic skills in taking care of a baby, e.g., how to change diapers, how to bathe a baby, and how to properly feed a baby. Beginning in 1991, shortly after the son's birth, DHR sent a case aide to assist the mother in learning the rudimentary housekeeping and child-raising skills she needed.
During direct examination, Dulaney was asked about the progress the parents made during the years she supervised the mother.
 "Q. Was there any progress made in those parenting areas during the time that you were working with them?
"A. No."
Dulaney testified that the parents regularly had loud arguments that often called for crisis intervention. She also stated that the mother regularly, as frequently as every other day before DHR removed the children, complained that her son's behavior was out of control and that she needed help handling him.
Charity Moore, a social worker with DHR, began visiting the family in February 2001. During her initial visit, she noticed that the bathroom and refrigerator needed cleaning, and she discussed with the mother the causes of roach infestations. A week later she returned and the house was much dirtier than it had been during her previous visit. There was food on the floor in the kitchen and in the dining room. The kitchen floor was tracked with mud as well. Clothes and toys were on the floor in the son's room, and he had written on the floor with markers. There were clothes and dirty diapers on the floor of the parents' bedroom. The bathroom had dirty clothes and dried urine on the floor, and several live roaches were in the bathtub. Moore and the mother discussed the cleaning tasks that needed to be performed and the types of cleaners that should be used.
Four days later, Moore returned to the house and noticed that the rooms were much cleaner. The dirty diapers and food were no longer on the floor, and the bathroom had been cleaned. Moore talked to the mother about taking steps to "baby-proof" the house, such as putting medicines out of reach.
Two weeks later Moore returned to the house to discuss a report that the mother had given her son a dose of her anti-depressant medication. The mother stated that her son had been out of control, and, because she could not find the medicine he had been prescribed for treatment *Page 261 
of attention deficit hyperactivity disorder, she had given him some of her prescription medication to calm him. The mother also stated that, later that same day, she had given him a dose of his own ADHD medicine. Moore testified that she discussed the potential dangers of giving a child medicine that had not been prescribed for him with the mother. During this visit Moore also observed an argument between the mother and her son regarding the television. The mother tried to discipline the son for changing the television station while the five-week-old daughter was seated in front of the television set. Moore had to explain to the mother that a newborn does not actually watch or understand television programs.
During her final visit, Moore observed the father trying to feed the baby with a filthy bottle; the mother said she had not washed it between feedings. Moore also observed dishes with dried food on the countertops, the stovetop, and the floor, and she noticed unidentifiable food in uncovered containers in the refrigerator. Floors were scattered with clothes, papers, and refuse; the bathroom floor had dried urine on it. Following this visit, DHR filed a dependency petition and removed the children from the parents' custody.
DHR placed the children in foster care. DHR formulated an Individualized Service Plan ("ISP") for the parents and assigned a case aide to teach the parents basic homemaking skills. According to the case aide, the parents made no improvement in their homemaking skills. The same case aide testified that she had been in the parents' home in 1991 and had tried to teach them the same skills at that time. During the ISP meetings both parents were hostile and threatened the DHR employees. After the parents continued to make no improvement, DHR filed its petition to terminate their parental rights.
Both the mother and the father have moderate to severe mental-health problems. Dr. Teresa Davis, a clinical psychologist, stated that as part of the review process before the termination hearing, both parents received thorough evaluations at a mental health center. The reports indicate that the mother has borderline intellectual functioning, which makes her prone to making poor judgments and impulsive decisions because she is unable to think through a specific situation completely. A person with borderline intellectual functioning can usually perform adequately in everyday settings but does not tolerate stress or frustration well and needs constant supervision to succeed in anything but simple, repetitive tasks. The mother also has been diagnosed with "schizotypal" personality features — e.g., paranoid behavior, bizarre thoughts, and inappropriate actions. The report concluded that the combination of her two conditions makes the mother incapable of supervising and raising a child without constant supervision. The evaluation concluded that the mother needs frequent, perhaps daily, guidance regarding housekeeping, nutrition, budgeting, and child raising. She cannot perform these tasks unassisted.
The father is receiving supplemental Social Security Income for his mental disability; he falls into the bottom 20 percent of the general population for mental function. The father also suffers from a generalized anxiety disorder that causes problems with sleeping and eating, which in turn results in constant irritability and nervousness. He also has a personality disorder that causes him to interact inappropriately with people. His combination of problems leads to an inability to manage stress in everyday life. In periods of stress, his temper becomes uncontrollable. Without continuous counseling and anger-management intervention, the evaluation concluded that the father should not have children in his care. *Page 262 
 I. Efforts to Rehabilitate
The parents first argue that DHR did not provide reasonable efforts to rehabilitate them. We disagree. The parents specifically argue that because Sue Thomas, the case aide, testified that she might not have spent two hours each week in their house, as required by the ISP, DHR did not provide reasonable efforts to rehabilitate them. Thomas's testimony is that she could not recall exactly how much time she spent at the parents' house each week. Furthermore, the evidence indicates that DHR provided a variety of in-home services to instruct the parents on caring for the newborn daughter, on meal preparation, and on budgeting for food costs. However, the evidence indicates that the parents did not ever learn how to perform these basic tasks without supervision. As stated above, DHR began its involvement with the family in 1991, and in 2001 DHR was still attempting to teach the parents basic housekeeping and child-caring skills. If the mother and the father had not mastered the basic principles of child care and housekeeping during a 10-year period of ongoing instruction, we conclude that requiring the case aide to spend more time with the parents during 2001 would not have resolved the problem. Therefore, we conclude that DHR provided reasonable efforts to rehabilitate the parents.
 II. Whether Rehabilitation Efforts Failed
The parents next argue that DHR failed to prove that the efforts to rehabilitate them had failed. We interpret this as a sufficiency-of-the-evidence argument. As stated above, DHR is required to prove by clear and convincing evidence that the children are dependent. The mother has borderline intellectual functioning and the father has a mental-retardation diagnosis. The evidence indicates that neither parent has learned basic parenting or housekeeping skills. During the 10-year period of DHR intervention, the caseworkers repeatedly tried to teach those basic skills to the parents. The evidence indicated that the son had to tell the mother how to feed the daughter her bottles. The evidence also showed that the father watched R-rated movies with inappropriate subject matter for children while they were present and that he became hostile with the caseworkers. By the time of the hearing, the mother had formally refused any further assistance from DHR and only accepted some general counseling. Based on this evidence, we conclude that clear and convincing evidence supports a finding that the children are dependent.
 III. Viable Alternatives
The parents lastly argue that the trial court erred by not properly considering and rejecting all viable alternatives to a termination of their parental rights. The alternative suggested by the parents is for DHR to reinstate the degree of services DHR provided when it first became involved with the family in 1991. The record indicates that a case aide was in the parents' home almost five days a week to ensure that the parents developed and maintained sufficient parenting and household skills. As stated above, clear and convincing evidence supports a finding that the children are dependent and that the parents are unable or unwilling to change their condition to care for the children. Therefore, on the facts of this case, we conclude that the viable alternative of providing intensive in-home help is not required and, in fact, would be futile, at this time.
 IV. Conclusion
The juvenile court's judgment terminating the parents' parental rights is affirmed.
AFFIRMED. *Page 263 
Yates, P.J., and Crawley, J., concur.
Thompson, J., concurs in the result.