971 So.2d 1 (2007)
Ex parte T.V.
(In re T.V.
v.
B.S.).
1050365.
Supreme Court of Alabama.
January 12, 2007.
Rehearing Denied February 9, 2007.
*2 Thomas H. Guthrie, Athens, for petitioner.
Brian C.T. Jones of Jones & Ayers, L.L.C., Athens, for respondent.

On Application for Rehearing
SEE, Justice.
This Court's opinion of December 15, 2006, is withdrawn, and the following is substituted therefor.
T.V., the mother of N.V., appeals the trial court's termination of her parental rights. Because the trial court failed to find by clear and convincing evidence that there was no viable alternative to terminating T.V.'s parental rights, we reverse its judgment and remand the case.

Facts and Procedural History
T.V. began using drugs in the 1980s and became addicted to crack cocaine in the 1990s. She continued to use crack cocaine while she was pregnant with N.V., her second child, who was born on June 2, 1999. While she was pregnant with N.V., T.V. sought assistance from the Department of Human Resources ("DHR") because, as a result of her drug addiction, she was homeless, was without employment or transportation, and was unable to perform her parental duties. She was also facing criminal misdemeanor charges.
Shortly after N.V.'s birth, DHR filed a dependency petition with regard to N.V. because of concerns about T.V.'s homelessness, drug use, and incarceration pending the criminal charges. N.V. was adjudicated dependent, and an agreement was reached among T.V., DHR, and B.S., an acquaintance of T.V.'s,[1] that B.S. would *3 have physical custody of N.V. and that T.V. would be allowed visitation as agreed between B.S. and T.V. There was a one-year period following the adjudication of dependency during which DHR attempted to reunite T.V. and N.V. DHR prepared an individual service plan ("ISP") addressing T.V.'s housing and drug problems, but it could not prepare a home study because T.V. was homeless. T.V. failed to comply with drug treatment recommended by the ISP; instead, she agreed to the permanent placement of N.V. with B.S. The next year, the trial court with jurisdiction over the dependency petition vested permanent legal and physical custody of N.V. in B.S., with T.V.'s consent, although the trial court retained jurisdiction to reopen the custody award. The award of permanent custody marked the end of DHR's involvement in the case; at that time T.V. was still addicted to crack cocaine.
Both the court's order and the record in the termination-of-parental-rights case establish that T.V. has now met the goals DHR originally set for her. She is no longer homeless, and she has dealt with her drug problem. She reconciled with and married D.R.V., the father of her first child. Through involvement with their church, T.V. and D.R.V. have quit using illegal drugs. T.V. testified that she has been drug-free since July 20, 2002. T.V. ministers to people with substance-abuse problems. She has maintained employment since July 20, 2002, with short interruptions. She has voluntarily contributed small amounts to N.V.'s support; these amounts total $270 since 2004.
T.V. testified that she first attempted to reestablish visitation with N.V. in 2002. She asserts that she understood that "B.S. was willing to help her in raising her son during the period of her drug addiction but would be willing to help facilitate the reunification of mother and child should T.V. overcome her drug addiction." T.V.'s brief at 8-9. However, according to T.V., B.S. and her husband, C.S., discouraged the reunification, not returning T.V.'s telephone calls or responding to notes T.V. left at B.S.'s house. On "numerous occasions," T.V. claims, she went to B.S.'s residence to see N.V., but B.S. would leave the residence with him and not allow T.V. to visit him. C.S. testified, to the contrary, that T.V. visited N.V. only four to six times from 1999 to 2000, and that, from 2000 until the petition was filed in March 2004, she did not visit at all.
Believing that B.S. was resisting her efforts to reunite with N.V., T.V. moved the trial court for visitation rights; the trial court awarded her one hour of supervised visitation each week. In March 2004, B.S. filed in the trial court the current petition to terminate T.V.'s parental rights. T.V. moved the court for additional visitation, but it terminated her parental rights before ruling on her motion.
The Court of Civil Appeals affirmed the trial court's judgment, without an opinion. T.V. v. B.S. (No. 2040406, Oct. 7, 2005), ___ *4 So.2d ___ (Ala.Civ.App.2005) (table). T.V. petitioned for, and this Court granted, certiorari review.

Issue
The issue before this Court is whether the trial court exceeded its discretion when it found that B.S. had presented clear and convincing evidence indicating that terminating T.V.'s parental rights was in N.V.'s best interest. T.V. argues that the trial court failed to consider her improved conduct and circumstances in making its decision to terminate her parental rights, that DHR failed in its duty to make efforts toward reuniting N.V. and T.V., and that B.S. had prevented contact between T.V. and N.V. in order to perpetuate the child's dependency as adjudicated.

Standard of Review
In order to terminate parental rights, the trial court must find by clear and convincing evidence that the child is dependent and that an alternative less drastic than termination of parental rights is not available. Ala.Code 1975, §§ 12-15-65(e), 26-18-1 to 26-18-10; Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). "The trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong." Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala.1993). "This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility." Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001). However, the party seeking to terminate parental rights has the burden to present clear and convincing evidence showing that the parent is not capable or is unwilling to discharge his or her parental responsibilities and that there are no viable alternatives to terminating parental rights. Ex parte Ogle, 516 So.2d 243, 247 (Ala.1987); see also K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (holding that the party seeking to terminate the parental rights of another bears the burden of proving that termination of those rights is the appropriate remedy).

Analysis
When deciding whether to terminate parental rights, "the primary focus of a court . . . is to protect the welfare of children and at the same time to protect the rights of their parents." Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Thus, "a court should terminate parental rights only in the most egregious of circumstances." Id. Beasley set forth a two-pronged test that must be applied in terminating an individual's parental rights. First, unless the petitioner is a parent of the child, the court must make a "finding of dependency." 564 So.2d at 954. For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights, including but not limited to the grounds specified in § 26-18-7.[2] 564 So.2d at 954. After making *5 a finding of dependency, the court must ensure that "all viable alternatives to a termination of parental rights have been considered." 564 So.2d at 954.
"Once the court has complied with this two-prong test  that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child  it can order the termination of parental rights."
564 So.2d at 954-55.
The Court of Civil Appeals has "consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala. Civ.App.2003); see also P.H. v. Madison County Dep't of Human Res., 937 So.2d 525, 531 (Ala.Civ.App.2006) (quoting D.O.).
T.V. argues on appeal that the trial court failed to give proper consideration to T.V.'s current conditions and conduct when it applied the two-pronged test and thus that the court's decision was plainly and palpably wrong. According to T.V., the factors that contributed to N.V.'s dependency no longer exist: T.V. provides some monetary support for N.V.; she exercises visitation; she married the father of her first child; she has proper housing, employment, and transportation; she is sober and drug-free; she regularly attends church; and she counsels others combating drug addiction.
A. Dependency
The trial court made a finding of dependency as to N.V., stating that there was
"clear and convincing evidence, competent, material and relevant in nature that [T.V.] is unable to discharge her responsibilities to and for [N.V.] and [her conduct and condition is] such as to render her unable to properly care for *6 the child and that such conduct or condition is unlikely to change in the foreseeable future."
The court recognized that many of the concerns that had led to the finding of dependency immediately after N.V.'s birth in 1999 no longer exist; however, the court concluded that T.V. had periodically abandoned N.V. and that "very little effort had been made by the mother to visit her child. . . . [T.V.] proffered the excuse that [B.S. and her family] did not make her feel welcome but the Court does not find that to be a reasonable excuse" because T.V. had other means, including the courts, to enforce visitation. Ultimately, the trial court again found that N.V. is a dependent child and that T.V. is unable to fulfill her parental obligations "because so much time has gone by that the child does not know [his mother]."
The trial court considered each factor listed in § 26-18-7, Ala.Code 1975. The record supports the court's finding that T.V. has consistently failed to support her child financially, and, although there was testimony to the contrary, there is sufficient evidence to support the finding that T.V. rarely contacted and visited her child before 2004.[3] Further, despite "her regular supervised visitation beginning in 2004," the trial court found that because of her long absence and sporadic visitation, T.V. currently cannot discharge her parental responsibilities. B.S. has raised N.V. since his birth; the child considers himself a member of B.S.'s family and does not understand who T.V. is; and Pam Locke, the social worker supervising the court-ordered visitation, testified as to her concern about the impact on N.V. of his discovering that B.S. is not his natural mother. Based on these findings, we cannot say that the trial court plainly and palpably *7 erred by determining that N.V. was dependent because T.V. could not perform her parental responsibilities.
B. Other Viable Alternatives
A finding of dependency alone will not allow a trial court to terminate a parent's rights to his or her child; the trial court also must find by clear and convincing evidence that there are no viable alternatives to the termination of parental rights.
T.V. argues that the trial court's finding that there was no viable alternative to the termination of her parental rights was incorrect because DHR had failed to work to facilitate the reunification of T.V. and N.V. The Court of Civil Appeals has consistently noted that "`[p]ursuant to the terms of a consent judgment in federal litigation, DHR has an affirmative duty to facilitate family reunification whenever that goal is possible.'" D.O., 859 So.2d at 444 (quoting V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ.App. 1998), citing in turn R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997)).[4] The trial court concluded that DHR's past efforts to reunite T.V. and N.V. were reasonable and had failed. It is, however, not clear from our caselaw whether DHR had a duty to perform a home study when B.S. petitioned the trial court to terminate T.V.'s parental rights. The cases cited by T.V. generally do not involve petitions by individuals, but instead involve petitions by DHR itself to terminate the rights of a parent or parents.[5]
It is also not clear from the record whether DHR intentionally ended its involvement with T.V.'s case or did so out of inadvertence. Neither party presented evidence explaining why DHR did not continue to supervise its placement of N.V. with B.S., even though the trial court, at the time the custody issue was initially decided, had explained to all parties that the custody decision was subject to being reopened by T.V. There is no indication that DHR has made any recent efforts to facilitate reunification; there has not been any examination of T.V.'s current ability or willingness to care for N.V. since B.S. received permanent legal and physical custody in 2000. The trial court did not order DHR to perform a home study nor did it hear any testimony by DHR social workers regarding T.V.'s current circumstances. Thus, it is not clear from the record what possible viable alternatives might have been found.
Finally, the evidence at trial demonstrated that DHR had placed N.V. with B.S. under the mistaken belief that it was making a relative placement. However, there is no evidence in the record indicating that the trial court ever considered a relative placement after learning that B.S. was not related to either T.V. or N.V. See *8 V.M., 710 So.2d at 921 (holding that the trial court had failed to consider all viable alternatives when it had not considered the possibility of placement with other family members).
In deciding that there was no viable alternative to the termination of T.V.'s parental rights, the trial court in this case expressed its concern that N.V. has known B.S. and her family as his only family. The court noted the evidence that was not in the record:
"No expert was called to explain away the possibly devastating consequences to this five-year-old child upon finding out that his family was not really his family and he would have to go live with strangers who lived in the same town with him but didn't really try to develop a relationship with him for five years."
This case is not about whether N.V. would have to leave B.S. and her family and live with strangers. The only issue in this case is whether there were grounds to terminate T.V.'s parental rights and whether there was a viable alternative to doing so. The trial court lauded the manner in which T.V. had turned her life around:
"While she has remained drug free since [N.V. was three years old], established a home with [the father of her older son] and her older son, has had sporadic employment, and is active in her church, she waited until [N.V.] was four-and-a-half years old to try to establish a relationship with him. The Court is aware that these accomplishments did not occur without a great deal of effort and time, but there has been no explanation why she ignored [N.V.] for so long and failed to forge a relationship with him while she continued to improve her life."
The only expert testimony was that T.V. was making progress in establishing her relationship with N.V., that a bond appeared to be emerging between them, and that a strong relationship could grow if it were nurtured. Further, the child's guardian ad litem argued that she did not believe it to be in N.V.'s best interests to terminate T.V.'s parental rights. She pointed out that N.V. had, in effect, two families attempting to meet his needs and to give him affection. She also pointed out that an alternative to terminating T.V.'s parental rights was to maintain the status quo, by which she meant that visitation would continue while permanent legal and physical custody would remain in B.S. The record as it currently stands thus does not demonstrate that the trial court examined all the viable alternatives to the termination of T.V.'s parental rights.
Justice Smith's dissent suggests that we have ignored the trial court's factual findings regarding T.V.'s past and present inability to care for her child. ___ So.2d at ___. In fact, it is these factual findings that form the basis of our holding that N.V. continues to be a dependent child. However, this Court must review not only whether N.V. remains dependent, but also whether the trial court considered and rejected, based on clear and convincing evidence, the possible viable alternatives before terminating T.V.'s parental rights. See Ex parte Ogle, 516 So.2d at 247 (holding that the party attempting to terminate a parent's parental rights has the burden to prove, by clear and convincing evidence, that there are no viable alternatives); J.D. v. Tuscaloosa County Dep't of Human Res., 923 So.2d 303, 307 n. 1 (Ala.Civ.App. 2005) ("When a nonparent such as DHR seeks to terminate parental rights, it must establish by clear and convincing evidence not only that the children are dependent but also that no viable alternative to termination of the parental rights exists."); D.O. v. Calhoun County Dep't of Human Res., 859 So.2d at 443 ("A nonparent who *9 seeks to terminate a parent's parental rights must prove by clear and convincing evidence that the children are dependent and that there are no viable alternatives to the termination of parental rights."); A.M. v. Lamar County Dep't of Human Res., 848 So.2d 258, 259 (Ala.Civ.App.2002) (same). The need to consider all viable alternatives is rooted, in part, in the recognition that the termination of parental rights is a drastic step that once taken cannot be withdrawn and that implicates due process. Thus, the Beasley two-pronged test is designed to protect the welfare of the child while also protecting the rights of parents. Beasley, 564 So.2d at 952. The requirement that clear and convincing evidence support the determination to terminate parental rights is based on the need to protect the due-process rights of the parents. Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The party seeking to terminate a person's parental rights thus has the burden of producing clear and convincing evidence that there are no viable alternatives to the termination of parental rights. Ex parte Ogle, 516 So.2d at 247; see also K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (holding that the party seeking to terminate the parental rights of another bears the burden of proving that termination of those rights is the appropriate remedy).
Further, as noted above, the Court of Civil Appeals has "consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights is based on clear and convincing evidence." D.O., 859 So.2d at 444. It is because the termination of parental rights implicates "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child," Santosky, 455 U.S. at 753, 102 S.Ct. 1388, that such an exacting level of certainty based on evidence of the parent's current situation is required. Thus, while we must presume under the ore tenus rule that the trial court's factual findings are correct, that rule does not relieve this Court of its responsibility to ensure that those facts clearly and convincingly warrant the termination of parental rights.
"`The appellate courts do not sit in judgment of the facts, and [they] review the factfinder's determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law.'" Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ. App.2003) (quoting Curtis White Constr. Co. v. Butts & Billingsley Constr. Co., 473 So.2d 1040, 1041 (Ala.1985)) (emphasis omitted). Justice Smith's dissent suggests that we are in the case before us "reweigh[ing] the evidence." ___ So.2d at ___. We are not; we are required, however, to determine whether clear and convincing evidence supports the trial court's conclusion that there is no viable alternative to the termination of T.V.'s parental rights, and that is the issue we address.
Borrowing from the statutory definition in § 6-11-20(b), Ala.Code 1975, relating to the award of punitive damages, the Court of Civil Appeals has defined what constitutes "clear and convincing evidence" in proceedings to terminate parental rights. In L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), that court stated that "`[c]lear and convincing evidence' is `[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" We do not believe that the evidence in this case clearly and convincingly *10 supports the factual finding that there are no viable alternatives to terminating T.V.'s parental rights.[6] The trial court's order includes a factual finding that T.V. has stopped using drugs, that she has reconciled with her family, that she participates in raising and supporting her other son, and that she regularly attends church. The only reason the trial court offered as justification for its finding that there is no viable alternative to the termination of T.V.'s parental rights was T.V.'s failure to visit N.V. and the child's corresponding inability to know her as his mother. However, the only evidence in the record regarding the effect of these absences on N.V. was the testimony that N.V. did not understand who T.V. was and the social worker's testimony that a bond between N.V. and T.V. was emerging. The trial court's concern that T.V. ultimately wanted to regain custody of N.V. does not, in itself, provide clear and convincing evidence that the current situation in which T.V. is allowed to visit with N.V. is untenable. Both B.S. and C.S. testified that they would eventually have to tell N.V. that he is not their natural son. The child still carries T.V.'s last name, and he uses that name at school. Thus, given that N.V. will one day have to learn that he is not B.S.'s natural son, visitation  which upon all accounts does not harm N.V. and which the guardian ad litem concluded is good for N.V.  would appear to be a viable alternative to the termination of T.V.'s parental rights. Therefore, the conclusion that there are no viable alternatives to terminating T.V.'s parental rights is not supported by clear and convincing evidence.
Because the trial court did not, after full consideration of all the viable alternatives to terminating T.V.'s parental rights, find clear and convincing evidence that none existed, the order terminating her rights must be reversed and the cause remanded to the trial court for a full consideration of viable alternatives to terminating of T.V.'s parental rights. See State Dep't of Human Res. v. A.J.T., 939 So.2d 46, 47-48 (Ala.Civ.App.2006) ("A termination of parental rights . . . should occur only after consideration of all possible viable alternatives to termination, and must be in the child's best interest.").

Conclusion
As the Court of Civil Appeals has stated on several occasions:
"`[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[ ] does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.'"
D.O., 859 So.2d at 445 (quoting V.M., 710 So.2d at 921). We reverse the trial court's judgment terminating T.V.'s parental rights and remand this case to that court for further proceedings consistent with this opinion.
*11 APPLICATION OVERRULED; OPINION OF DECEMBER 15, 2006, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
NABERS, C.J., and LYONS, HARWOOD, WOODALL, and PARKER, JJ., concur.
STUART, SMITH, and BOLIN, JJ., dissent.
STUART, Justice (dissenting).
I concur with Justice Smith's dissent; I offer the following additional observations. The majority remands this case for the juvenile court to reconsider whether there are any viable alternatives to terminating T.V.'s parental rights,[7] including allowing N.V. to remain in the custody of B.S. and her husband with T.V.'s having visitation rights. I have reviewed the record; I conclude that the juvenile court has considered the alternatives, including the option the majority appears to advocate, and has found no alternative to be viable. This finding is supported by clear and convincing evidence. I believe this Court is asking the juvenile court to do what it has already done. Therefore, I respectfully dissent.
In its written order, the juvenile court stated:
"No expert was called to explain away the possibly devastating consequences to this five-year-old child upon finding out that his family was not really his family and he would have to go live with strangers who lived in the same town with him but didn't really try to develop a relationship with him for five years."
The majority apparently reads this statement as indicating that the juvenile court did not consider all alternatives. Unlike the majority, I read this statement to mean that the juvenile court did consider the alternative of having custody remain with B.S. and her husband and T.V.'s having visitation rights. (T.V. has indicated that although she seeks visitation now, she will seek custody in the future.) The juvenile court, however, rejected this alternative because, in light of T.V.'s conduct throughout N.V.'s life, this alternative was not in N.V.'s best interest. This finding is supported by clear and convincing evidence.
Pursuant to mandatory federal statutes, like the Adoption and Safe Families Act ("the ASFA"), see 42 U.S.C. § 620 et seq., and the Social Security Act, § 471, states have spent decades pursuing "reasonable efforts to reunite children with their families." This pursuit of the reunification of children and their families extended for unlimited periods and reached unreasonable degrees at the expense of the children, often resulting in extremely negative consequences for children, including, but not limited to, "foster care drift," where children move from one foster home to another, and attachment disorders, where children are incapable of emotional attachment to another human being. In 1997, the federal government recognized the harm such requirements were causing the children and modified the ASFA to place equal or greater emphasis on a child's safety and permanence when a court or an agency is determining what is in the best interests of the child. Social Security Act, § 471, as amended, 42 U.S.C. § 671.
The "best interest of the child" is always of paramount importance in cases involving child custody and the termination of parental rights. In making such a determination, *12 the court or the agency determining the best interest of the child must give great weight to the stability, security, and permanency of the relationship between the child and the child's caregiver. As the Nebraska Supreme Court has held:
"[W]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. In re Interest of Joshua M. et al., 251 Neb. 614, 558 N.W.2d 548 (1997). . . . The concept of permanency is not simply a `buzzword,' as [the mother] contends, but, rather, a recognition that when there is no reasonable expectation that a natural parent will fulfill his or her responsibility to a child, the child should be given an opportunity to live with an adult who has demonstrated a willingness and ability to assume that responsibility and has a permanent legal obligation to do so."
In re Sunshine A., 258 Neb. 148, 158, 602 N.W.2d 452, 460 (1999).
The juvenile court recognized that stability, security, and permanency are in the best interests of all children, and in particular, of N.V.; this Court should likewise recognize the importance of stability, security, and permanency in determining what is in the best interest of children and particularly what is in the best interest of N.V. Therefore, I dissent.
BOLIN, J., concurs.
SMITH, Justice (dissenting).
I respectfully dissent.
The majority reverses the judgment of the trial court terminating T.V.'s parental rights as to N.V. and remands this case because "[t]he record as it currently stands . . . does not demonstrate that the trial court examined all the viable alternatives to the termination of T.V.'s parental rights." 971 So.2d at 8. The majority opinion states:
"There is no indication that DHR has made any recent efforts to facilitate reunification; there has not been any examination of T.V.'s current ability or willingness to care for N.V. since B.S. received permanent legal and physical custody in 2000. The trial court did not order DHR to perform a home study nor did it hear any testimony by DHR social workers regarding T.V.'s current circumstances. Thus, it is not clear from the record what possible viable alternatives might have been found."
971 So.2d at 7.
An understanding of the chronology of events in this case is critical in determining whether the trial court erred in terminating T.V.'s parental rights on the basis that DHR did not reinstitute reunification efforts, did not conduct a home study, and/or did not explore other viable alternatives, including other potential relative resources, to the termination of T.V.'s parental rights.
The child, N.V., was born on June 2, 1999. The evidence indicated that the child's mother, T.V., used crack cocaine before the child's birth. It is uncontroverted that the child has never resided with or been in T.V.'s custody. T.V. was arrested at the hospital following N.V.'s birth, and the child was placed with the custodian, B.S., and her husband, C.S., when T.V. left the hospital following his birth. DHR filed a dependency petition on June 8, 1999.
The trial court's order states that "a seventy-two hour shelter care hearing was held on June 10, 1999, wherein the mother agreed to [B.S.'s] receiving the temporary legal and physical custody of the child as a relative resource placement." Tracy Sherrill, a DHR social worker, testified that B.S. was not licensed as a foster parent *13 but was considered a relative placement because T.V. and B.S. were "cousins by marriage or something and we were able to consider that a relative." Both DHR and T.V. considered B.S. a relative of the child's.
After DNA testing excluded as a father the only person named by T.V. as N.V.'s father, the trial court, on December 14, 1999, adjudicated N.V. to be dependent.
Unfortunately, DHR's efforts for reunification of T.V. and N.V. from June 1999 to the date of the permanency hearing in December 2000, failed because T.V. did not avail herself of the services offered by DHR. She did not attend substance-abuse treatment, she failed to secure housing, and she failed to keep DHR or B.S. apprised of her whereabouts.
N.V. was 18 months old and had always resided with B.S. when the trial court, at the permanency hearing in December 2000, awarded custody to B.S.B.S. believed she was being awarded "permanent custody" of N.V. There is no indication that DHR continued in its reunification efforts after B.S. was awarded custody following the permanency hearing. Furthermore, there is no indication that the court conducted an ongoing court review after the child was placed with B.S. and her husband following the permanency hearing.
N.V. was four years old when T.V. first filed a motion with the court seeking both visitation and "ultimately the return of custody." I have reviewed the record in its entirety, and I note that there are conflicts in testimony regarding T.V.'s efforts to visit N.V. and T.V.'s contention that B.S. and her husband interfered with her visitation efforts. The trial court's findings in its order of January 13, 2005, in support of its decision to grant B.S.'s petition to terminate T.V.'s parental rights are supported by the evidence presented at trial:
"The court finds from clear and convincing evidence, competent, material and relevant in nature that [T.V.] is unable to discharge her responsibilities to and for [N.V.] and her conduct or condition is such as to render her unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future.
"In determining that [T.V.] is unable to discharge her responsibility to and for the child, the court has considered the following:
"[T.V.] has periodically abandoned her child. There has been a voluntary and intentional relinquishment of the custody of the child by his mother, or a withholding from the child, without good cause or excuse, by the mother, of her presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or a failure to perform the duties of a parent. While [T.V.] asserted she always meant to get [N.V.] back when she agreed to [B.S.'s] having his custody, there were many four-month or longer periods during the past five years when she abandoned him. However, there is no presumption of abandonment because [T.V.] filed her motion to enforce visitation with him prior to [B.S.'s] filing this petition.
"[T.V.] has an extensive history of excessive use of controlled substances of such duration or nature as to render her unable to care for the needs of the child. She admitted that she began using drugs in the 1980's and became an addict in the early 1990's. She completed a thirty-day residential program in 1995 or 1996, failed to complete a court-ordered residential program in 1999, and completed an outpatient program in *14 2000. However, [T.V.] testified that she was an addict until July 20, 2002. She asserts that she has remained drug-free since that time. She has been required to submit to drug testing for employment on several occasions and has passed the tests. While she is now drug-free, her previous addiction contributed to her inability to now care for [N.V.] because so much time has gone by that the child does not know her.
"There is evidence that [T.V.] abused the child by using crack cocaine prior to his birth. [N.V.] has never been in [T.V.]'s custody. The child was placed with [B.S.] when he left the hospital following his birth.
". . . .
"Reasonable efforts by the Department of Human Resources leading toward the rehabilitation of [T.V.] failed. Individualized Service Plans (ISPs) were held immediately upon the filing of the dependency petition. They addressed housing and drug treatment. DHR was unable to prepare a home study on [T.V.] because she did not have a home and sometimes her whereabouts were unknown during the planned reunification process between removal and permanent placement. There was a one-year period between the adjudication of dependency and the permanency hearing for [T.V.] to meet the goals to achieve reunification. [T.V.] did not comply with drug treatment and ultimately agreed to permanent placement with [B.S.].
". . . .
"[T.V.] has failed to provide for the material needs of [N.V.] or to pay a reasonable portion of his support where she is able to do so. By her own testimony, she was a drug addict until he was three years old so that the court finds that she chose to support her habit rather than her child. [T.V.] asserted that she provided a bassinet and monitors and a few other baby items when the child was born but [B.S. and her husband] deny this. She testified that she set up an account for [N.V.] but did not divulge its existence to the child's custodians and it has an approximate $25 balance as of this hearing date. She testified that she worked from February 2003 until March 2004, June 2004 until September 2004, and currently from the fall of 2004. She testified that her husband always worked. However, money order receipts entered into evidence reflect that she has paid $270 in total support and only began paying support in March 2004. [B.S. and her husband] have supported the child continuously for five years.
"[T.V.] has failed to maintain regular visits with [N.V.] The permanency agreement reached in December 2000 included visitation to be arranged by [B.S. and her husband] and [T.V.]. [B.S. and her husband] have not moved. [T.V.] has lived in the same town. Very little effort has been made by the mother to visit her child. Her descriptions of attempts to visit were not time or date specific and related to [B.S. and her husband] leaving when [T.V.] came by or not coming to the door. It is no wonder when she was not around the child for years that the child grew up with the belief that [B.S. and her husband] were his parents. It is not unreasonable for them to have been apprehensive to allow sporadic visitation with a mother who was a drug addict or former drug addict that the child did not know. [T.V.] did maintain regular supervised visitation beginning in 2004 pursuant to her request to the court for assistance enforcing visitation. However, it was not revealed to the court until this termination hearing that the child did not know who *15 he was visiting due to the absence of the mother in his life during the preceding years. According to her testimony, [T.V.] knew how to contact a judge to help her enroll in drug treatment. She knew how to contact a Decatur lawyer about visitation. There was testimony that she had completed high school and possibly some college and is obviously intelligent. No explanation was given by [T.V.] why she failed to contact the court regarding these visitation issues until the child was four-and-a-half years old. [B.S.'s husband] testified that during 1999-2000 [T.V.] visited her son four to six times, from 2000-2001 she did not visit her child and from 2001-2002 she did not visit her child. During 2003 he asserted that she did not visit her child before she filed a motion with the court in December 2003 to exercise visitation. [T.V.] proffered the excuse that [B.S. and her husband] did not make her feel welcome but the court does not find that to be a reasonable excuse to not visit her child for virtually four-and-a-half years.
"[T.V.] has failed to maintain consistent contact or communication with the child. [B.S. and her husband] have lived in the same place since the child was born. [T.V.] has lived in the same town. They have common relatives. [B.S. and her husband] have changed their phone number once in five years. [T.V.] has never spoken to [N.V.] on the telephone. [B.S.'s husband] testified that she called a little in 2000-2001 and did not call at all between 2001 and 2003. [B.S.] and [T.V.] related that [T.V.] did call [B.S. and her husband] on [N.V.]'s second birthday to arrange a visit. However, [T.V.] was incarcerated and was not given a pass for the visitation. [T.V.] gave [N.V.] a race car for Christmas when he was a toddler and has given him no other Christmas or birthday presents. She testified that she bought him a guitar but was never able to give it to him even though she lived in the same town and did not leave it for him at B.S.'s residence or mail it to him.
"There has been a lack of effort on the part of [T.V.] to adjust her circumstances to meet the needs of the child. [T.V.] was a drug addict until the child was three years old. While she has remained drug free since that time, established a home with [her husband] and her older son, has had sporadic employment, and is active in her church, she waited until [N.V.] was four-and-a-half years old to try to establish a relationship with him. The court is aware that these accomplishments did not occur without a great deal of effort and time, but there has been no explanation why she ignored [N.V.] for so long and failed to forge a relationship with him while she continued to improve her life."
Despite these detailed findings, the majority remands the case for the trial court to consider viable alternatives to terminating T.V.'s parental rights because there was no updated home study to explore relative resources; no recent reunification efforts by DHR; and no consideration by the trial court of other alternatives such as maintaining the status quocustody with B.S. and visitation with T.V.as recommended by the guardian ad litem.
I respectfully dissent because I do not believe that a remand to the trial court is warranted. The court has already considered T.V.'s motion for visitation and "ultimately return of custody" and found that not to be a viable alternative. Specifically the trial court's order states:
"[T]here are no viable alternatives to termination of the parental rights of the mother. It appears that B.S. is related to [T.V.] by marriage. The child's guardian ad litem argued that the petition *16 should be denied and the case remain status quo. However, `status quo' for [N.V.] is living with [B.S. and her husband] and not visiting with or knowing [T.V.] Supervised visitation has occurred with the child having no idea who [T.V.] is and why he should visit with her or his half-brother or her husband. [T.V.] agreed to the permanent placement of the child with [B.S. and her husband] four years ago. [N.V.] has lived with them continuously since he came home from the hospital. He knows them as his parents and their children as his sisters. He does not know who [T.V.] is. While the court is aware of the presumption that a child should be placed with his parents, the court finds that his parents are [B.S. and her husband]the only parents he has ever known. No expert was called to explain away the possibly devastating consequences to this five-year-old child upon finding out that his family was not really his family and he would have to go live with strangers who lived in the same town with him but didn't really try to develop a relationship with him for five years. Ultimately, despite the parental presumptions of his biological mother, the court must consider what is in the best interest of [N.V.]. [T.V.] has waited too long to develop a relationship and bond with him so that she is unable to discharge her responsibilities to him and her conduct of omission renders her unable to properly care for him. This conduct cannot change in the future because she cannot bring back the first five years of her child's life."
Initially, I recognize that we must give deference to the trial court's findings:
"When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. . . ."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ. App.1981). In regard to custody determinations, this Court has also stated: `It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.' Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)."
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
The trial court clearly found, despite the conflicts in testimony, that T.V. had made no meaningful efforts to support, visit, or even communicate with N.V. from the date of his birth in June 1999 until she filed her court proceeding in December 2003.
Section 26-18-7, Ala.Code 1975, provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or *17 condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
". . . .
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
". . . .
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
The trial court, in accordance with the considerations mandated by § 26-18-7, Ala.Code 1975, outlined in detail its findings that there was no viable alternative to the termination of T.V.'s parental rights. The trial court found that T.V. had, in fact, abandoned her child, irrespective of whether a presumption of abandonment should be applied because T.V. had filed her motion to enforce visitation before B.S. filed the petition to terminate T.V.'s parental rights. I agree with the trial court that the evidence supports a finding that T.V. had, in fact, abandoned N.V. from his birth in June 1999 to the date she filed her petition for visitation and ultimately custody.
The majority states that "[t]his case is not about whether N.V. would have to leave B.S. and her family and live with strangers." 971 So.2d at 8. Rather, the majority holds that "the [trial court's] conclusion that there are no viable alternatives to terminating T.V.'s parental rights is not supported by clear and convincing evidence." 971 So.2d at 10.
That conclusion of the majority, however, fails to properly consider the specific ore tenus findings of the trial court. Although it is true, as the majority points out, that the trial court heard no expert testimony "`explain[ing] away the possibly *18 devastating consequences to this five-year-old child upon finding out that his family was not really his family,'" 971 So.2d at 8 (quoting trial court's order), the trial court correctly noted that, nonetheless, the status quo was no viable alternative to the termination of T.V.'s parental rights because N.V. would be, in essence, visiting with a total stranger, and T.V.
"has waited too long to develop a relationship and bond with him so that she is unable to discharge her responsibilities to him and her conduct of omission renders her unable to properly care for him. This conduct cannot change in the future because she cannot bring back the first five years of her child's life."
Furthermore, T.V. offered no explanation regarding "why she ignored [N.V.] for so long and failed to forge a relationship with him while she continued to improve her life."
The majority suggests that had DHR conducted a current home study or attempted current reunification efforts or explored other potential relatives, particularly given the mother's recently improved situation, other options to the termination of her parental rights could have been considered.
As to the issue of the home study, the majority concedes that T.V. generally cites cases in which DHR itself had petitioned to terminate parental rights and that it is not clear from our caselaw whether DHR has a duty to perform a home study for a termination-of-parental-rights proceeding in which it is not the petitioner. Under circumstances such as those here, I would hold that a DHR home study at this juncture, while perhaps helpful, is not required, particularly in light of the reasonable efforts by DHR during the first 18 months of N.V.'s life, which efforts failed because of the mother's faults and bad habits. Section 12-15-65, Ala.Code 1975, states in pertinent part:
"(g) If the court enters an order removing a child from his or her home or continuing a child in a placement outside of his or her home pursuant to this title, the order shall contain as specific findings, if warranted by the evidence, all of the following:
"(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
"(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home, or that an emergency situation exists which requires the immediate temporary removal of the child from his or her home due to the emergency situation.
"(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed.
". . . .
"(m) As used in this chapter, `reasonable efforts' refers to efforts made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home, and to make it possible for a child to return safely to the child's home. In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child's health and safety shall be the paramount concern. If continuation of reasonable efforts is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child."
*19 The requirements of § 12-15-65 were met in this case. The trial court conducted the permanency hearing when N.V. was 18 months of age, placed custody of the child with the only relative identified by the mother, and apparently scheduled no further court reviews. DHR had apparently met its responsibility, mandated by § 12-15-65(g) and (m), to provide reasonable efforts to facilitate family reunification. Notably, T.V. never challenges the sufficiency of DHR's reunification efforts in the first 18 months of N.V.'s life. Instead, T.V. argues that DHR should have reinstated those efforts in December 2003, when she filed for visitation and "ultimately the return of custody." The majority agrees with T.V. and relies on D.O. v. Calhoun County Department of Human Resources, 859 So.2d 439, 444 (Ala.Civ.App.2003) (citing R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997)), for the proposition that "`DHR has an affirmative duty to facilitate family reunification whenever that goal is possible.'"
The majority's reliance on D.O. and R.C. is, however, misplaced. First of all, in D.O., DHR held custody of the child and petitioned for termination of parental rights. Second, R.C., cited in D.O., dealt specifically with a plaintiff class of "all children who are now, or in the future will be, children in foster care and/or DHR custody who have emotional or behavioral disorders." 969 F.Supp. at 687. N.V. was never placed in foster care by DHR. Except for the willingness of B.S. and her husband in June 1999 to accept N.V. into their home at the mother's suggestion, N.V. might well have gone into foster care when the mother was arrested at the child's birth. Instead, DHR and the trial court did precisely what 42 U.S.C. § 675(5)(A)(c) prescribes. DHR placed the child with a relative identified by the mother in a "safe setting that is the least restrictive . . . and most appropriate setting available" and subsequently held a permanency hearing. The trial court, as § 12-15-71(a)(3)(c) prescribes, placed N.V. with a relative, who, after a study by DHR, was found by the court to be qualified to receive and to care for the child. Apparently, DHR then closed its protective-services case, and the court discontinued court reviews because N.V. had been placed with a relative in a "permanent" situation. To expand the principles of D.O. to this case when DHR had afforded reasonable efforts over 18 months to reunite a newborn infant with his mother, and those efforts failed because of the mother's neglect of her child and her substance abuse is to expand the principles of R.C. to the detriment of children by eliminating permanency.
Given the evidence, had DHR, at the permanency hearing in December 2000, filed a petition to terminate T.V.'s parental rights and advocated "permanent" custody with B.S., a relative identified by the mother, the agency clearly could have sustained its evidentiary burden for legally severing all ties of the mother. Because DHR simply sought instead "permanent" custody with B.S. at the permanency hearing, and did not file a petition to terminate T.V.'s parental rights, N.V.'s permanency is now at risk. T.V.'s intentions are clear. After abandoning her child for four years, she now seeks not only visitation, but also "ultimately return of custody."
The trial court was able to view the demeanor of the witnesses and to assess their credibility, and after doing so found T.V. to have abandoned her child and found that it would be contrary to the best interest of the child, at five years of age, to have contact with his biological parent, who is virtually a stranger to him. The trial court further found that given the mother's abandonment and her status of a stranger to her child she is unable now *20 and in the foreseeable future to properly discharge her responsibilities to and for her child. We should not, under the ore tenus standard of review, reweigh the evidence and find otherwise. Therefore, I dissent.
STUART and BOLIN, JJ., concur.
NOTES
[1] It appears that B.S.'s stepbrothers are T.V.'s first cousins. DHR apparently considered this placement a "relative placement" rather than a "foster placement," although there is no consanguinity between T.V. and B.S.T.V.'s brief at 7. There is no statutory definition of "relative" with respect to placements; § 12-15-71, Ala.Code 1975, simply states that if a child is found to be dependent, the court can place the child in the legal custody of DHR, a private child-care agency, or a "relative or other individual . . . found by the court to be qualified to receive and care for the child." Alabama courts have recognized that the possibility of placing a child with a relative is a viable alternative to terminating parental rights. V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998) (holding that the trial court had failed to consider all viable alternatives when it had not considered the possibility of placement with other family members). Whether the placement of N.V. was originally considered a foster placement or a relative placement, the parties now agree that whatever it might then have been considered by DHR, the placement was not a relative placement. In any event, our decision does not rest on whether DHR considered the original placement at that time to be a foster placement or a relative placement.
[2] While not limiting the elements that can be a part of the trial court's decision, § 26-18-7 requires the trial court to consider the following:

"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following [crimes].
". . . .
"(8) That parental rights to a sibling of the child have been involuntarily terminated."
Further, when the child is not in the custody of the parent, § 26-18-7 requires the trial court to consider, among other factors:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
[3] T.V. claims that B.S. and her family prevented her from having contact with N.V. in "an attempt to perpetuate the child's dependency and consequently bolster their case to terminate the mother's parental rights." In K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App. 2003), in which the Court of Civil Appeals found the evidence offered in support of the trial court's termination of parental rights insufficient, DHR decided to join the foster parent's petition to terminate K.W.'s parental rights. DHR was concerned about "the child's apparent failure to bond with the mother." 856 So.2d at 872. The trial court had found that DHR's role in the case was to facilitate, if possible, reuniting the mother and the child. The foster parents, however, "actively sought to prevent the reunification" by trying to prevent visitation and by petitioning to terminate parental rights and to adopt the child themselves. 856 So.2d at 873. The Court of Civil Appeals concluded that "the evidence supports a conclusion that the foster parents' conduct in seeking to terminate, rather than support, the relationship between the child and the mother, has also contributed to the child's confusion and failure to bond with the mother." 856 So.2d at 873.

In this case, T.V. testified that she understood when she gave B.S. custody of N.V. that B.S. would work with her to eventually reunite mother and child. However, B.S.'s husband testified that he believed that the order entered in 2000 granting B.S. permanent legal and physical custody terminated T.V.'s parental rights. Pam Locke, the social worker supervising the visitation, testified that N.V. said that B.S. would not let him come back to the court-ordered visitation. See L.M. v. D.D.F., 840 So.2d 171, 178-79 (Ala.Civ. App.2002) (reversing termination of father's parental rights where mother actively prevented him from visiting his children). It was only after T.V. requested more visitation and began sending money to help support N.V. that B.S. brought the petition to terminate the parental rights. Moreover, the trial court did not find that T.V. was not prevented from visiting, but instead concluded that T.V. should have done more to force the visitation.
Nonetheless, we presume that the trial court's factual findings are correct, especially in the face of conflicting testimony. Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). The court's order stated only that B.S. and her family made T.V. feel unwelcome, not that T.V. was actually prevented from visiting N.V.
[4] Justice Smith's dissent correctly points out that R.C. involved only a class of children with emotional and/or behavioral disorders who were in DHR custody. ___ So.2d at ___. The Court of Civil Appeals, however, has not limited its understanding of DHR's duty to pursue family reunification to those circumstances. In fact, D.O. itself apparently did not involve a class of such children, and the Court of Civil Appeals' opinion makes no reference to any of the children's having special needs. See generally D.O., 859 So.2d at 440-443 (laying out the facts of the case).
[5] We do not hold that DHR had an affirmative duty to intervene in this case. However, the trial court's finding that there were no viable alternatives to terminating T.V.'s parental rights must be supported by clear and convincing evidence relating to T.V.'s current circumstances and parenting abilities. One possible source of such evidence could have been a home study, had DHR done one.
[6] Justice Smith offers that, "[g]iven the evidence, had DHR, at the permanency hearing in December 2000, filed a petition to terminate T.V.'s parental rights and advocated `permanent' custody with B.S., a relative identified by the mother, the agency clearly could have sustained its evidentiary burden for legally severing all ties of the mother." ___ So.2d at ___. However, we do not have before us a petition to review such a hypothetical December 2000 order; DHR did not petition in December 2000 to sever all ties of the mother. The matter before us is whether there is, at this time, clear and convincing evidence of the absence of any other viable alternative to the termination of T.V.'s parental rights.
[7] I have written previously concerning the lack of a statutory basis for this requirement and the fact that it is "judge-made" law. See Ex parte C.V., 810 So.2d 700, 728 (Ala.2001) (Stuart, J., concurring in the result in part and dissenting in part).